UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------X
                                               :

UNITED STATES OF AMERICA,            :

                                                :

           vs.                              : 3:17 Cr. 158 (RNC)

                                                :

HOMERO JOSHUA GARZA.           :

                                                :

               Defendant.                  :

                                                :

                                                :
------------------------------------------------------------X

 

## SENTENCING MEMORANDUM ON BEHALF OF
## HOMERO JOSHUA GARZA

 

BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
Telephone: 212.223.0200

*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................1

II.   BACKGROUND ........................................................................................2

    A.    Josh's Personal History..................................................................2

    B.    The Offense Conduct and First Interactions with the Government ...................6

III.  THE SENTENCING GUIDELINES CALCULATION ................................................7

    A.    Federal Sentencing Framework .......................................................7

    B.    Sentencing Guidelines Analysis .....................................................9

        1.    The Guidelines' Approach to Loss Results in a Sentence Recommendation That Is Greater Than Necessary and Overstates the Degree of Josh's Culpability........................................10

        2.    Application of the ABA Guidelines Produces a Far More Reasonable Advisory Range ................................................11

IV.   A NON-INCARCERATIVE SENTENCE IS WARRANTED.....................................13

    A.    A Non-Incarcerative Sentence is Justified Based on Josh's Good Character and Family Circumstances ...................................14

        1.    Good Character .....................................................................14

        2.    Family Ties .........................................................................15

    B.    Josh's Role with Respect to his Business Supports a Variance from the Guidelines .........................................................19

    C.    The Need for the Sentence..............................................................20

    D.    In the Alternative, to Achieve the Goals of Sentencing, the Court Should Consider Imposing a Sentence of Home Confinement and a Substantial Community Service Condition.......................................24

CONCLUSION............................................................................................28

## TABLE OF AUTHORITIES

**Page(s)**

*Audet, et al. v. Stuart Fraser, GAW Miners, LLC and ZenMiner LLC*,
    No. 16-cv-940 (MPS) (D. Conn.) ..................................................................21

*Kimbrough v. United States*,
    552 U.S. 85 (2007)..........................................................................7, 8, 14

*Pepper v. United States*,
    562 U.S. 476 (2011)................................................................................13

*Peugh v. United States*,
    569 U.S. 530 (2013)..................................................................................8

*Rita v. United States*,
    551 U.S. 338 (2007)........................................................................8, 11, 15

*Spears v. United States*,
    555 U.S. 261 (2009)..................................................................................8

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)................................................14, 24

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008)......................................................................8

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013)....................................................................10

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004)......................................................10

*United States v. Faibish*,
    No. 12-cr-265 (ENV), 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) ..........................11

*United States v. Faibish*,
    No. 12-cr-265 (ENV) (E.D.N.Y. Mar. 10, 2016)........................................11

*United States v. Lehmann*,
    513 F.3d 805 (8th Cir. 2008) ...................................................................17

*United States v. Litvak*,
    No. 13-cr-19 (JCH) (D. Conn. July 23, 2014) ......................................10, 13

*United States v. Lumiere*,
    No. 16-cr-483 (S.D.N.Y. Jun. 14, 2017)....................................................................10

*United States v. Marsh*,
    820 F. Supp. 2d 320 (E.D.N.Y. 2011) ......................................................................18

*United States v. Martin*,
    520 F.3d 87 (1st Cir. 2008).................................................................................16, 17

*United States v. Milikowsky*,
    65 F.3d 4 (2d Cir. 1995)......................................................................................19, 20

*United States v. Mullings*,
    131 F. Supp. 3d 1 (E.D.N.Y. 2015) ..........................................................................18

*United States v. Munoz-Nava*,
    524 F.3d 1137 (10th Cir. 2008) ................................................................................17

*United States v. Nellum*,
No. 04-cr-30 (PS), 2005 WL 300073 (N.D. Ind. Feb. 3, 2005)................................15

*United States v. Parris*,
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) ......................................................................11

*United States v. Patel*,
    No. 97-1580, 1998 WL 650589 (Table) (2d Cir. 1998)............................................20

*United States v. Peterson*,
    363 F. Supp. 2d 1060 (E.D. Wis. 2005)....................................................................26

*United States v. Preacely*,
    628 F.3d 72 (2d Cir. 2010).........................................................................................13

*United States v. Rivernider*,
    828 F.3d 91 (2d Cir. 2016).........................................................................................12

*United States v. Rivernider*,
    No. 10-cr-222 (RNC) (D. Conn. Dec. 18, 2013) .......................................................12

*United States v. Rowan*,
    No. 06-cr-321, 2007 WL 127739 (E.D. Pa. Jan. 10, 2007) .......................................14

*United States v. Rowe*,
    No. 10-cr-607, 2011 WL 6019010 (E.D.N.Y. Nov. 29, 2011) ...................................15

*United States v. Schroeder*,
    536 F.3d 746 (7th Cir. 2008) .......................................................................17

*United States v. Serafini*,
    233 F.3d 758 (3d Cir. 2000)..........................................................................15

*United States v. Shamilzadeh*,
    No. 04-cr-1094 (JG) (E.D.N.Y. Apr. 1, 2008)............................................26

*United States v. Smith*,
    359 F. Supp. 2d 771 (E.D. Wis. 2005).......................................................17

*United States v. Warner*,
    No. 13-cr-731 (CPK) (N.D. Ill. Jan. 14, 2014) ...........................................25

## **Other Authorities**

18 U.S.C. § 3553.................................................................................*passim*

U.S.S.G. § 2B1.1................................................................................*passim*

U.S.S.G. § 3B1.1................................................................................*passim*

U.S.S.G. § 3E1.1................................................................................*passim*

## I.     PRELIMINARY STATEMENT

We respectfully submit this memorandum on behalf of Homero Joshua Garza, whom we have represented for more than three years.  It is our hope that this memorandum adequately conveys to the Court who Josh was before his offense, who he was during his offense, who he is today, and why the Josh who engaged in criminal conduct is a different individual than the one who will be stand before the Court for sentencing.  Josh is deeply sorry for his conduct and the harm it caused to the victims and the victims' families.  As he acknowledged in his plea of guilty, the pre-sentence interview with the Probation Office and in his letter to the Court, he openly recognizes the serious nature of the crime he committed and accepts full responsibility for his actions.

Congress has provided that a sentence imposed must be "sufficient, but not greater than necessary" to accomplish the goals of sentencing.  We respectfully submit that, upon full consideration of the goals of sentencing – deterrence, incapacitation, rehabilitation, retribution, and restitution – with the backdrop of Josh's life before GAW Miners, his conduct while at GAW Miners and his life and rehabilitation after GAW Miners, the most appropriate sentence is a non-incarcerative one.

Josh is keenly aware that he cannot be forgiven for the harm that he has done.  It is, however, Josh's entire life history and character that are of significance when fashioning an appropriate sentence to fit his conviction.  He is working tirelessly to rebuild his life so that he can repay the victims and support his family.  He has a new business – one which provides an opportunity to begin to repay the victims of his crime – and is committed to his family and to his Christian faith.  These endeavors have helped him to understand how he came to veer from an otherwise law-abiding life and make the terrible lapses in judgment that bring him before the Court. He has come to appreciate that his measure as a father and a man is not success in the commercial

world – and the material comforts that he can provide to his family – but the moral example he sets for his children and living a life committed to integrity, charity and kindness.  As more fully detailed below for the Court's consideration, this is the story of Josh's life and the strong core values that guided and defined his very existence.

For these and myriad other reasons set forth in the complete record before the Court, we respectfully submit that a non-incarcerative sentence would be just and proportional, and "sufficient, but not greater than necessary" to accomplish the goals of sentencing.

## II.   BACKGROUND

### A.   Josh's Personal History

As in any case, the crime that brings Josh before this Court did not occur in a vacuum.  As always, it arises out of a set of circumstances and characteristics unique to the individual now before the Court.  Born in 1985, Josh was raised in Friendswood, Texas.  He came from a broken home; his biological father abandoned the family while Josh's mother was pregnant with Josh, and Carlos, Josh's adoptive father, was frequently abusive, a drug addict, and would also go on to abandon the family.  Josh's childhood was isolating and, sadly, often destitute.  His memories of these years are often of those spent alone in his room, hidden from his adoptive father, Carlos.  He recalls lacking basic necessities and, as his mother contracted a debilitating infection, both he and his siblings became dependent upon the local church and others in the community.

Josh met his wife, Jessica, in 2002, while they were both attending Friendswood High School in Friendswood, Texas.  While Josh was in his junior year, Jessica's family made the decision to move to Vermont.  Josh – in love with Jessica and desperate for a better life – accompanied them.  The two have been married for nearly twelve years, are raising three young children, and are currently expecting a fourth – Jessica is due to give birth in March 2019.

Josh has proven talents – apparent even in his teenage years – for technology and entrepreneurialism.  While living with Jessica's parents in Vermont, and still in high school, Josh founded his first company, Optima.  It was a computer repair company.  Due to the small size of the community, word of mouth quickly spread and Josh soon became a "go-to" of sorts.  Upon graduation, he determined to use the modest amount he had earned to sign a lease on a vacant storefront.  Jessica's father, Alan, attests, "I have watched Josh grow as a businessman from starting a computer company in my basement to securing a store front location [] to a main street presence in the community he served and beyond."  Ex. A at L-8.[1]  While Josh would go on to other entrepreneurial pursuits, including his work to provide affordable access to the Internet to rural communities who would otherwise be without,  the fact is that Josh, since the age of 18, has worked hard and consistently been employed.

Indeed, Josh is a smart, self-educated, "hard-working and loyal" individual.  L-14.  Even now, he has undertaken a new business endeavor that, despite its nascent stage (the company is less than one year old), is already generating revenue and continues to grow each month.  *See* PSR ¶ 52.  In addition to Jessica, who also helps with the company's day-to-day operations, Josh has enlisted more than ten as-needed independent contractors to assist with various tasks.  Josh is hands on in the company, not only forging the business relationships but also doing the laborious work alongside the independent contractors.   Developing that business, in an arena he is most comfortable with, is a testament to his industrious nature, and how he can and will get back on his feet to be a productive member of society.

---

[1]     Subsequent references to Exhibit A will cite only to the page number which begins with "L-."

Josh is also a good and decent man who cherishes his family.  Indeed, both the letters of support and the PSR highlight Josh as an exemplary husband, father, brother, and in-law.  In this regard, he has repeatedly demonstrated to others (both before and after this matter arose) that while he erred, he is and continuously strives to be deeply devoted to his family and to put their needs above his own.  Jessica, in her letter of support, writes that Josh is "an exceptional husband," and of his relationship to their children, she writes,

> he takes special time out for each and every one of our children. They are all very different and have very different personalities and he works to foster each of their unique gifts.  He spends time with each to have special bonding moments and character building lessons. He will teach them what it means to take the "high road" and how to love unconditionally.  Because of these lessons, you will often here our children talk amongst themselves and ask the other whether they are taking the "high road" during a dispute.

L-5.  Similarly, Ashley L., Josh's sister-in-law and aunt to his three young children, states,

> He has always done everything in his power to take care of his family, whether it be my sister (his wife), their three children, his own brothers, sister, and parents, or any extension of his family. He still does take wonderful care of his family, putting their needs before his own.

L-13.  Those who have written to the Court express a man who is devoted to his wife, children, family, and their community.

Moreover, from a young age, Josh was instilled with the values of the Christian faith – values he holds dear even today.  Both he and Jessica are active members of their Church community and are raising their children in a religious and principled home.  As attested to in the letters of support, Josh has channeled his Christian faith into acts of kindness and generosity, both big and small.  For example, Josh funded and helped lead a charitable mission to a local orphanage in Haiti to set up a computer lab and remained there for two weeks to teach the many children living there basic computer skills.  L-6, 9.  Michael S., a pastor of a church to which Josh and his

family once belonged, attests to Josh's extreme generosity, "above and beyond [his and Jessica's]

regular giving." L-21.  Echoing these statements, Alan attests that,

> [a]s a family man Josh is teaching his three children the value of his
> faith and Christianity.  He always reserves Sunday for church and
> bible school for the children.  They pray together as a family every
> night of the week.  This is an important daily event for him and his
> family.  It strengthens his family and the bonds of love they have for
> each other.  After prayer they talk, laugh, play and just be a family.
> It's a wonderful example of the importance of his family in his life.
> His oldest son is already a businessman at age 10, emulating
> everything his daddy does.

L-9.  Presently, both Josh and Jessica are active members of Community Bible Church and are

being trained to lead courses on marriage.

Josh's commitment to community improvement also manifests itself in day-to-day acts of

kindness that, we submit, bespeak an individual more interested in helping others than in seeking

any reward or recognition.  For instance, Eddie M., who met Josh nearly five years ago in a bible

study group, recalls that, "[a]t the time I just wanted to give up on life," "Josh truly brought the

good out of me and my family."  L-15.  During this time, Eddie was unemployed and he and his

family were experiencing significant financial difficulties.  The family car continued to break

down and, because of that, Eddie was unable to attend a number of bible study sessions.  Josh,

after learning the reason why, surprised Eddie and his family with a new car.  *Id.*  Eddie also recalls

Josh's other acts of kindness, including hiring Eddie while he continued to look for more

permanent work.  Corey R., a friend of Josh's for more than twelve years and former employee of

Optima, describes Josh as "overwhelmingly loving" and a "true mentor," and recounts the many

ways that Josh made a positive impact on his life. L-15.  Whatever faults about Josh his conviction

has revealed, one thing remains unchallenged; the opinion of his peers that he is a spiritual,

generous and loving individual who cares deeply about others.

**B.      The Offense Conduct and First Interactions with the Government**

On July 20, 2017, Josh plead guilty to a single count of wire fraud.  For a period of approximately nine months, and at the age of 29, Josh was the founder and CEO of GAW Miners, ZenMiner and ZenCloud (the "Companies").  During the relevant time period, Josh defrauded the Companies' investors, in multiple instances, by making false claims about how these companies operated, the value of the products and services they offered and the state of their business dealings.

As set forth in Josh's own letter to the Court, his motivations and intent for the creation of GAW Miners was drastically different from what it ultimately became.  In particular, he states that, "I had never been involved with cryptocurrency before, and while the company started with a legitimate purpose, it was not long before the thought of the financial freedom began and ultimately turned into greed."  Ex. B at 2.  Josh was giddy with the opportunities presented by the burgeoning cryptocurrency industry, and, while operating the business, spent lavishly and foolishly.  In a matter of months, the undertaking spiraled irreparably out of control.  As business floundered, Josh desperately tried to keep these companies afloat.  He writes,

> It was not long before the company started to run out of money, I thought I could fix it.  I started liquidating assets and putting funds back into the company.  It quickly became clear that my efforts were not enough. The business failed, many people were hurt and my family was left with nothing.

*Id.*

Without for a moment seeking to minimize his conduct, we respectfully submit that the circumstances of his offense make plain that Josh did not calculatingly set out to steal or defraud anyone – this was not a crime *ab initio*.  After GAW Miners began its operations, Josh made fateful decisions to lie to his investors, and their investments were spent foolishly.  The victim letters addressed to the Court, each of which Josh has read, are a wrenching reminder that his actions

have gravely impacted the lives of many.  He appreciates that there is no excuse for his conduct,

which is the result of his own poor judgment and weakness.  As he states in his letter to the Court,

> I know I've caused people a great deal of harm and pain. There is
> not a single excuse I can offer. The only thing I can offer is a willing
> attitude and heart to try and to make things right. I also know that I
> can not turn back time, or even expect forgiveness.

Ex. B at 3.  Similarly, the Probation Office attests that,

> Josh is "fully aware of the impact of his conduct on himself, his
> family and the many victims in this case … [and] deeply remorseful
> with respect to the scope of his involvement in the offense, as well
> as the negative impact it directly has had."

PSR ¶ 78.

In July 2017, Josh consented to the filing of an Information.  He waived various rights that

were otherwise conferred to him, including the right to indictment and the right to appeal, and pled

guilty pursuant to a plea agreement.  He was candid about his own criminal conduct.

## III.    THE SENTENCING GUIDELINES CALCULATION

### A.    Federal Sentencing Framework

As the Court is aware, the sentence imposed on Josh should be driven by the "overarching"

command of 18 U.S.C. § 3553(a), which "instruct[s] district courts to 'impose a sentence

sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough v.*

*United States*, 552 U.S. 85, 101, 111 (2007).  The sentencing court must consider the whole range

of factors in 18 U.S.C. §3553(a), including that the sentence should "reflect the seriousness of the

offense," "provide just punishment for the offense," "afford adequate deterrence to criminal

conduct," and "protect the public from further crimes of the defendant." 18 U.S.C. §3553(a).  The

Court also must consider "the nature and circumstances of the offense," as well as "the history and

characteristics of the defendant," "the need to avoid unwarranted sentence disparities," and "the

kinds of sentences available." *Id.*

Although the Court must consider the Guidelines as part of the sentencing process, we emphasize that they are merely advisory and serve only "as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough* at 90.  These factors include: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines; (5) any relevant policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted disparities among similar offenders; and (7) the need to provide restitution to victims of the offense.

The Court has "wide discretion to impose a non-Guidelines sentence" and indeed, the circumstances to justify a non-Guideline sentence need not be "extraordinary."  *See United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008).  In that regard, a non-Guidelines sentence is warranted where a sentencing judge finds that a particular Guideline or Guideline range fails to properly reflect § 3553(a) considerations, reflects "unsound judgment" or when "the case warrants a different sentence regardless."  *Rita v. United States*, 551 U.S. 338, 351, 357 (2007).  The Supreme Court clarified this point:

> [e]ven when a particular defendant . . . presents no special mitigating circumstances -- no outstanding service to country or community, no unusually disadvantaged childhood, no overstated criminal history score, no post offense rehabilitation -- a sentencing court may nonetheless vary downward from the advisory guideline range. . . . The only fact necessary to justify such a variance is the sentencing court's disagreement with the guidelines.

*Spears v. United States*, 555 U.S. 261, 263-64 (2009) (*per curiam*); *see also Peugh v. United States*, 569 U.S. 530, 536 (2013) ("The district court 'may not presume that the Guidelines range is reasonable,' and it 'may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views.'") (citations omitted).

**B.      Sentencing Guidelines Analysis**

We respectfully submit that Josh's sentence should not turn on the Guidelines, because other considerations, including his good character, family and community ties, and lack of prior convictions are compelling.  To the extent they do figure in the Court's determination of an appropriate sentence, and for the Court's convenience, set forth below is the parties' agreed-to advisory range.

As stated in the plea agreement, the parties agree that Josh begins with a base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a).  That level is increased by 18 levels, pursuant to U.S.S.G. § 2B1.1(b)(1), in accordance with the agreed upon loss amount, which is greater than $3,500,000 but less than $9,500,000.  That level is increased by 2 levels, pursuant to U.S.S.G. § 2B1.1(b)(2), as the offense involved 10 or more victims.  That level is further increased by 2 levels, pursuant to U.S.S.G. § 3B1.1(b)(c), as Josh was "an organizer, leader, manager or supervisor."  Finally, that level is decreased by 3 levels, pursuant to U.S.S.G. § 3E1.1, for Josh's prompt acceptance of responsibility.  The parties therefore agreed, and the Probation Office has concurred that Josh's total offense level to be 26:

| CATEGORY | POINTS |
|---|---|
| Base Offense Level - § 2B1.1(a) | 7 |
| Loss Enhancement - § 2B1.1(b)(1) | 18 |
| Victim Enhancement - § 2B1.1(b)(2) | 2 |
| Role in the Offense - § 3B1.1(b)(c) | 2 |
| Acceptance of Responsibility - § 3E1.1 | -3 |
| **Total Offense Level** | **26** |

Josh has no prior criminal history; therefore his criminal history level for purposes of the Sentencing Guidelines is a Category I.  The advisory Guidelines range associated with an adjusted offense level of 26 for an individual with a criminal history Category I is 63 to 78 months of imprisonment.

### 1. The Guidelines' Approach to Loss Results in a Sentence Recommendation That Is Greater Than Necessary and Overstates the Degree of Josh's Culpability

The Guidelines analysis in this case, even though legally correct, calls to mind the growing consensus among district courts that rigid application of the §2B1.1 loss table in economic crime cases is neither just nor effective.  *See*, *e.g.*, *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (describing the amount of loss as a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence").  Indeed, as Chief Judge Janet C. Hall of this district explained in imposing a 24-month sentence (despite a Guideline range of 108 to 135 months that was driven primarily by an 18-level loss enhancement), the fact that loss "is easily quantifiable . . . shouldn't overwhelm or cause [a court] to ignore other important but less quantifiable characteristics."  Tr. at 136, *United States v. Litvak*, No. 13-cr-19 (JCH) (D. Conn. July 23, 2014), ECF Dkt. No. 273 (conviction vacated on other grounds).  In this Circuit, judges have gone even further in their criticism of the loss table:

- "[B]roken," leaving judges "without meaningful guidance in high-loss cases."  *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J., concurring).

- "Ridiculous, absurd, barbaric" and "bear[ing] no relationship" to "any of the factors set forth in Section 3553(a)."  Sent. Tr., *United States v. Lumiere*, No. 16-cr-483, (S.D.N.Y. Jun. 14, 2017) (Rakoff, J.) (ECF Dkt. No. 115) at 28.

- "[M]uch more typical of a brutal regime than of a proud American legal system."  *Id.*

- "Mindless acceleration" for which "a whole host of judges … have said so publicly and scores of others … [have] grumbled about it privately."  *United States v. Faibish*, No.

12-cr-265 (ENV), 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015); Sent Tr., *United States v. Faibish*, No. 12-cr-265 (ENV), (E.D.N.Y. Mar. 10, 2016) at 23.

- A "black stain on common sense." *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.).

These insights are remarkably relevant in this case, where the advisory range is driven principally by the loss table. As the Court may consider arguments that a guideline reflects an unsound judgment or that a different sentence is otherwise appropriate, *Rita*, 551 U.S. at 357, we respectfully submit that the advisory range ought to be determined by a far more carefully tailored method.

### 2. Application of the ABA Guidelines Produces a Far More Reasonable Advisory Range

As the Court is aware, in April 2013, the Criminal Justice Section of the American Bar Association assembled a Task Force ("ABA Task Force") to evaluate the reforms needed in the sentencing of federal economic crimes and to draft a proposed federal sentencing guideline to effectuate those reforms.[2] The ABA Task Force published its report on November 10, 2014, and is annexed hereto at Exhibit C ("ABA Guidelines"). We submit that the calculation rendered by the application of the ABA Guidelines may properly be considered by this Court and weigh in favor of a non-incarcerative sentence in this case, even before considering additional factors not considered by the ABA Task Force.

In assessing culpability, the drafters of the ABA Guidelines suggest that sentencing courts consider "an array of factors," including the defendant's motive and the "correlation between the

---

[2]      The Task Force consists of a number of notable professors, practitioners, organizational representatives, observers from the Department of Justice and the Federal Defenders, as well as current and former judges, including the Honorable John Gleeson, the Honorable Judd Rakoff, the Honorable Gerard Lynch, and the Honorable Nancy Gertner, and Yale Law School professor Kate Stith.

amount of loss and the amount of the defendant's gain." Ex. C at 1. In considering motive, the report distinguishes offenses, like this one, that are "legitimate *ab initio*," *i.e.*, offenses that arise from "otherwise legitimate efforts that have crossed over into criminality as a result of unexpected difficulties," from more predatory offenses. *Id*. at 2-3. In this regard, we are especially mindful that this Court has had previous occasion to apply the ABA Guidelines to a defendant.[3] In *United States v. Riverinder*, 828 F.3d 91, 111 (2d Cir. 2016), this Court observed that the defendant "was not a predatory fraudster" and "had engaged in significant investment activity." 828 F.3d 91, 111 (2d Cir. 2016). And, "although [the defendant] misled clients about the risk, he did not steal from them outright." *Id.* This Court therefore held that the ABA Guidelines, which provided a recommended sentence of 144 months' incarceration, was "preferable to" the 324-405 month calculation under the Guidelines for the reason being that the Guidelines "significantly overstate[d]" the defendant's culpability. Sent Tr., *United States v. Riverinder*, No. 10-cr-222 (RNC) (D. Conn. Dec. 18, 2013) at 206:10-13, 212:5-14.

The ABA Guidelines have been applied to other defendants as well in this Circuit. *E.g.*, *Faibish*, 2015 WL 4637013, at *2 (rejecting the Guidelines' recommended 80-year sentence and instead imposed a 63-month sentence by relying on the ABA Guidelines under Section 3553(a), stating, "[t]he Court also takes notice that the [ABA Task Force] offers an alternative model to consider in sentencings for crimes of the stripe committed by [defendant].""). In *Faibish*, the court concluded that the "while the current guidelines system does not provide a reasonable way to … try to provide fair and just punishment … the [ABA Guidelines] certainly significantly move in that direction." Sent. Tr., (E.D.N.Y. March 10, 2016) at 23:20-25, 54:2-3, 10-11. The *Faibish*

---

[3]    Of particular note is that this Court applied the methodology set forth under the ABA Guidelines prior to ABA's release of the final draft.

Court went on to state that analysis under the ABA Guidelines was "fairly reflective of what a court is required to do under Section 3553(a)." *Id*.

Finally, in *United States v. Litvak*, in determining the appropriate sentence to impose, Chief Judge Janet C. Hall stated that the court was in "complete agreement with the drafters of [the ABA Guidelines], some of whom are very highly regarded judges in this circuit, in which the drafters urge the courts not to focus on things that are easily quantifiable." Sent. Tr., *Litvak*, No. 13-cr-19 (JCH) (D. Conn. July 23, 2014) at 135-136.). Despite a guideline recommendation in the pre-sentence report of 108-135 months' incarceration, Judge Hall sentenced the defendant to 24 months. In our view, application of the approach suggested by the ABA Report would result, at most, in an advisory Guideline range of 27 to 33 months.[4]

## IV.   A NON-INCARCERATIVE SENTENCE IS WARRANTED

While the Guidelines form the starting point of the Court's analysis, they are just that – a starting point. *See United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010) ("the Guidelines are guidelines – that is, they are truly advisory.") (citation omitted). Indeed, the Court has wide latitude to vary from the Guidelines based upon the factors enumerated in 18 U.S.C. § 3553(a) to ensure that the punishment "fit[s] the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citation omitted). The law is clear that this Court, in making its

---

[4]      In our view, application of the approach suggested by the ABA Report should result in an advisory Guidelines range of 21 to 27 months. The offense level would begin with a base offense level of 7, combined with a loss enhancement level of 10, in addition to the 0-level enhancement to reflect a "moderate" level of culpability, the two-level enhancement for the appropriate victim impact level. With the adjustments for multiple victims (2-level enhancement) and acceptance of responsibility (3 levels removed) set forth in the plea agreement, the resulting total offense level would be 18. Even assuming a higher level of culpability and victim impact any sentence for Josh's conduct promulgated under the ABA Guidelines would be below the advisory Guidelines range (*e.g.*, "high" culpability (3-level enhancement) and "moderate" victim impact (2-level enhancement) would result in an advisory Guidelines range of 46 – 57 months).

"individualized assessment" of Josh, must consider all the facts and circumstances in fashioning a sentence which meets §3553(a)'s express mandate of imposing a sentence that is "sufficient, but not greater than necessary" to meet the purposes imposed by law. *Kimbrough*, 552 U.S. at 101, 111 (citation omitted).[5]

A.      **A Non-Incarcerative Sentence is Justified Based on Josh's Good Character and Family Circumstances**

As Judge Rakoff said a decade ago, "[i]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006). We respectfully submit that the good from Josh's life, and all that he has done to repair his criminal conduct, outweighs the bad and justifies a non-incarcerative sentence. In passing judgment, we urge the Court to place Josh's conduct in the context of an otherwise commendable young life, his close family ties, and the degree to which his family depends upon him.

1.      **Good Character**

In considering the factors set forth in 18 U.S.C. § 3553(a), courts have appropriately imposed non-incarcerative sentences, even when the nature and circumstances of the defendant's offense may suggest that a term of imprisonment would be justified, where the defendant's conduct was aberrant or otherwise inconsistent with his history and characteristics. *See, e.g.*, *United States v. Rowan*, No. 06-cr-321, 2007 WL 127739, at *8 (E.D. Pa. Jan. 10, 2007) (imposing term of home confinement and probation where defendant had no criminal history, and, "by all accounts was a hard-working citizen [and] lacked a good education, but only because he quit school at age 16 to

---

[5]      The ABA Guidelines note that the sentencing court should continue to separately consider *offender* characteristics in accordance with 18 U.S.C. § 3553(a). Ex. C at 10.

begin working and help provide for his family [and noting that his] conduct smacks more of aberrant behavior than premeditated fraud.").

Josh has lived a law-abiding life until the instant offense began.  Indeed, as set forth in the Information, the relevant time period for his offense was just nine months, during a time when he was younger than 30, and in an area he had never worked before.  Numerous courts have imposed a sentence below the Guideline range where the offense conduct was an aberration that is at odds with the defendant's life and character.  *See United States v. Rowe*, No. 10-cr-607, 2011 WL 6019010, at *2 (E.D.N.Y. Nov. 29, 2011) (imposing sentence of time served, despite Guidelines range of 70-87 months' imprisonment, where, among other things, the offense was "out-of-character with the defendant's prior law-abiding life" and defendant had "been almost continuously employed since 1999.").

Josh's many prior good deeds highlight the aberrational nature of his conduct here.  As the letters in support show, he has dedicated his time, money and resources over his young life to others.  His charitable acts have helped individuals and families both near and far.  We submit that these acts can be considered as one of the factors appropriate in imposing a sentence under the advisory guidelines.  *See Rita*, 551 U.S. at 364-65 (Stevens, J., concurring) ("Matters such as . . . charitable, or public service are not ordinarily considered under the Guidelines [but are] matters that § 3553(a) authorizes the sentencing judge to consider."); *United States v. Serafini*, 233 F.3d 758, 774-75 (3d Cir. 2000) (affirming downward variance where the facts showed the defendant whose acts were not "just giving money" but "were acts of giving time, of giving one's self").

### 2.    Family Ties

Josh's extraordinary ties to his wife, children and in-laws are also "pertinent to crafting an appropriate sentence."  *United States v. Nellum*, No. 04-cr-30 (PS), 2005 WL 300073, at *4 (N.D.

Ind. Feb. 3, 2005).  As John Martin, former United States Attorney and later district judge for the

Southern District of New York, observed in retiring from the bench:

> [e]very sentence imposed affects a human life and, in most cases,
> the lives of several innocent family members who suffer as a result
> of a defendant's incarceration.  For a judge to be deprived of the
> ability to consider all of the factors that go into formulating a just
> sentence is completely at odds with the sentencing philosophy that
> has been a hallmark of the American system of justice.

John S. Martin, Jr., *Let Judges Do Their Job*, N.Y. TIMES (June 24, 2003) at A31.  Given this, it is

important that the Court know that, between August 2015 to today, after GAW Miners, Josh and

his family have were struck by two tragedies.  First, in August 2015, Josh's younger brother, Josiah

Garza, died after a motorcycle accident.  Nineteen months later, Josh's mother overdosed on

medication after an argument with him about money.  As Josh recalls in his letter to the Court,

> [w]hen our financial situation was at its worst, I called and begged
> my mom for help.  After a few days, she told me she could not help.
> The next day I was awoken by a call from my brother telling me she
> had passed away due to an overdose of medication.  To this day, I
> replay our conversation in my head and still wonder what would
> have happened if I had not put so much pressure on her.  This is
> something I will always struggle with for the rest of my life.

Ex. B at 3.  The loss of his mother has affected Josh profoundly; it is a cross that he will forever

bear.

Courts have often varied downward under the Guidelines based the potential impact of a

sentence on members of a defendant's family.  In *United States v. Martin*, for example, the district

court sentenced a defendant to considerably less than the lower end of his Guideline range because

of his law-abiding life and close family relationships.  520 F.3d 87, 89-90 (1st Cir. 2008).  The

First Circuit upheld this variance as reasonable, explaining that district courts "may take

idiosyncratic family circumstances into account, at least to some extent, in fashioning a variant

sentence." *Id.* at 93.  Those circumstances, including the defendant's "commitment to religion and

family" and "the reciprocal commitment exhibited by his family," increased "the likelihood of meaningful rehabilitation . . . to a level meriting some weight in the section 3553(a) calculus." *Id.* at 94.

We submit that the circumstances in in this case are as compelling as those in *Martin.* Jeannine H., Jessica's mother, describes Josh as a "very loving and an attentive husband to my daughter," "a very good provider for his wife and his children," and "always striving to be a good example for his children." L-11. Jessica similarly attests that Josh is "a generous and loving individual who has taken care of her and the children." PSR ¶ 45. Christine C., a mother of four children and who has known Josh for more than ten years, attests that Josh's "interaction with his children [is] refreshing," and that he is "kind and gentle." L-1.

That Josh is a constant source of love and emotional support warrants a variant sentence. *See*, *e.g.*, *United States v. Munoz-Nava*, 524 F.3d 1137, 1142-43 (10th Cir. 2008) (affirming downward variance in part due to defendant's role as "primary caretaker and sole supporter" of his son); *United States v. Lehmann*, 513 F.3d 805, 808-09 (8th Cir. 2008) (*per curiam*) (affirming downward variance based on the negative impact incarceration would have on defendant's son); *United States v. Smith*, 359 F. Supp. 2d 771, 776-782 (E.D. Wis. 2005) (reducing defendant's sentence by half, even after a 15-level downward departure on other grounds, because the defendant had been in a stable relationship for several years, supports his children, cares for his mother and obtained letters as to his good character from members of his community). Indeed, at least one Court of Appeals has reversed a district court's out-of-hand rejection of a defendant's familial obligations as a basis for a variance. *See United States v. Schroeder*, 536 F.3d 746, 756 (7th Cir. 2008).

A downward variance is appropriate in this case because incarcerating Josh would have significant negative impacts on the rest of his family, including his innocent wife and children (and his yet to be born child), who depend on him as their economic pillar.  Moreover, and in addition to the responsibility of home-schooling and caring for their three young children (in addition to caring for what will soon be a fourth child), ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████.

We submit that an incarcerative sentence would pose an additional harm on the family due to the impending birth of Jessica and Josh's fourth child.  It is a sad truth that if Josh were sentenced to some term of confinement, Jessica will face a significant hardship.  While she will of course do what she must in order to ensure the health and safety of their children, she cannot take the place of a father who should and who must be present in her life.  Now, just as before, his family relies on Josh for financial support.  Josh and Jessica are at a pivotal stage in their lives – the family is finally beginning to breathe easier after wrenching times.  Respectfully, a term of confinement would exact a toll on Josh's family that, in similar instances, have been grounds for a departure or variance.  *See*, *e.g.*, *United States v. Mullings*, 131 F. Supp. 3d 1, 4 (E.D.N.Y. 2015) (non-Guidelines sentence appropriate where custodial sentence would "cause hardship to [defendant's] wife and three young children who all depend on him"); *United States v. Marsh*, 820 F. Supp. 2d 320, 351 (E.D.N.Y. 2011) (non-Guidelines sentence appropriate because longer sentence of imprisonment "would likely cause undue stress to [defendant's] child").

**B.**     **Josh's Role with Respect to his Business Supports a Variance from the Guidelines**

Josh's role as CEO and individual responsible for the day-to-day oversight and operation of his new company provides another significant reason that this Court, most respectfully, should fashion a sentence that keeps Josh at home and continuing to operate the business.  As discussed above, Josh and Jessica depend on the continued operation of the business for their livelihoods.[6] Without Josh there tending to the business, dealing with their customers and, we submit, providing the many benefits the business offers to its customers, is yet another factor for the Court to consider.  *See* § 5K2.0 (for the proposition that while a single mitigating factor may not warrant a downward departure, a combination of factors might).

Courts have recognized – as with an extraordinary family circumstance – that a defendant's crucial role in a business can provide a reason for relief from the Guidelines where many innocent employees will be hurt if the business suffers or fails because of a defendant's incarceration.  *Cf. United States v. Milikowsky*, 65 F.3d 4 (2d Cir. 1995).  While we recognize that *Milikowsky* involved many more employees than Josh's company, the Court in that case found that a probationary sentence was appropriate given the "extraordinary impact that the loss of [the defendant's] daily involvement would have on his business and, consequently, on his employees." *Id.* at 8.  The Court referenced the many letters and testimony as to the "indispensability" of the defendant to his two businesses.

> [The defendant] is the only individual with the knowledge, skill, experience and relationships to run [the steel trading business] on a daily basis; he is the sole buyer of all steel, the only person with the requisite ability and contacts to buy steel at competitive rates, the most successful seller, and the person who deals with [the company's] customers and suppliers.

---

[6]     We also note the negative impact that would be felt by the company's contract employees.

*Id.* Moreover, the Court recognized that, given the precarious financial circumstances of the businesses, the absence of the defendant "might well" cause a credit problem and the ultimate demise of the company, resulting in "the loss of employment for [the company's employees]." *Id.*

We respectfully submit that the parallels here supports a non-Guidelines sentence. Josh has moved at a rapid pace to start a new business that is already generating profits. As Josh describes in his letter to the Court, he believes that it is highly unlikely that the business – which relies completely on his expertise – will succeed if he is sentenced to a term of incarceration. Indeed, courts have echoed the reasoning of the Court in *Milikowsky* on similar facts and circumstances. *See United States v. Patel*, No. 97-1580, 1998 WL 650589 (Table), at *2-4 (2d Cir. 1998) (departure upheld based upon, *inter alia*, the "adverse effect" of incarceration given the defendant's "involvement in his donut shops, which employ twelve people" and for which his role "extend[ed] to every aspect of the operation").

### C.    The Need for the Sentence

Section 3553(a)(2) requires the Court to consider the "need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," as well as the need to "afford adequate deterrence to criminal conduct," and to "protect the public from further crimes of the defendant." Under the circumstances presented here, it is not necessary to imprison Josh to accomplish these goals.

First, there is no doubt that Josh would be exiting the criminal justice system a better man than he was when he went in. He has acknowledged his responsibility for his criminal conduct and shown sincere remorse for that conduct. Josh vividly appreciates the difference between right and wrong, having developed a track record of self-rehabilitation that makes it highly unlikely he will ever re-offend. Indeed, it is because of his lifelong history as a law-abiding citizen that he

particularly appreciates the seriousness of his conduct.  To the extent that past conduct is a predictor of future conduct, for almost all of his years Josh has been an exemplary, law-abiding citizen.  Josh has demonstrated that he will do the right thing and remain true to his core values. In that regard, he has been steadfast in providing meaningful assistance to the civil plaintiffs in an action against an investor of GAW Miners and ZenMiner,[7] has settled with the SEC, agreed to disgorge $9,182,000, and pay pre-judgment interest in the amount of $742,774.[8]

Second, we submit that the impact already felt by Josh's family as a result of this offense militates in favor of a non-incarcerative sentence.  Indeed, Josh is acutely aware of how his conduct has caused his family to suffer in ways that very few defendants' families do, and that no one should.  As described in Josh's letter to the Court, his conduct led to his children, at times, to rely upon food stamps so that they could eat while Josh and Jessica were stretching their food rations. He writes,

> It was not long before the company started to run out of money, I thought I could fix it. I started liquidating assets and putting funds back into the company. It quickly became clear that my efforts were not enough. The business failed, many people were hurt and my family was left with nothing. We moved back to Vermont from Connecticut with Jessica's family. We had significant debt and recurring payments with no more income and we finally ran out of money. My wife and I legitimately reduced the amount of meals we had per day because we wanted the food stamps we received to go towards our children. It was not long before we had to sell our home, my wife's wedding ring, most of our furniture.

---

[7]     The caption of the civil suit is *Audet et al. v. Stuart Fraser, GAW Miners, LLC and ZenMiner LLC.*, No. 16-cv-940 (MPS) (D.Conn.).  We note that Josh was originally a defendant in this action; the suit against him was dismissed contemporaneous with his decision to cooperate with the plaintiffs.

[8]     Upon an order of restitution in this case, this disgorgement amount will be reduced accordingly.

Ex. B at 2.  As described in the PSR, as a direct result of Josh's conduct, his wife and children have been threatened repeatedly on the Internet with acts of violence, sexual assault, kidnapping, and have had intimate and highly personal pictures posted.  *See* PSR ¶¶ 45, 79.  His children's lives have repeatedly been threatened, and there have been numerous threats to rape Jessica.  We do not bring this to the Court's attention to seek sympathy; rather, we raise it here in order to demonstrate that Josh is acutely aware that his conduct has brought about these threats, in that had he not engaged in the underlying conduct, there would have been no opportunity for these threats to have been made.

Third, and in white collar cases in particular, research on deterrence proves that "informal sanctions (such as social censure, shame, and loss of respect)" are "equally important in producing the deterrent outcome."  Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007).  There is no empirical evidence that lengthy sentences provide any additional deterrent effect.  In this regard, studies of white collar offenders from before the enactment of the Guidelines show no difference in recidivism patterns between offenders who received jail time and those sentenced to probation.  David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 CRIMINOLOGY 587 (Nov. 1995).  Rather than longer sentences, it appears to be the criminal process itself – charge, trial, conviction, and sentencing – that has the greatest impact on the offender, and the period of imprisonment adds little by way of deterrence.  *Id*.; *see also* John Braithwaite, *Crime, Shame and Reintegration* 69 (Cambridge Univ. Press 1989) ("It would seem that sanctions imposed by relatives, friends or a personally relevant collectivity have more effect on criminal behavior than sanctions imposed by a remote legal authority.").  If specific

deterrence is achieved by sending a clear message to the defendant, Josh has received this message loud and clear.

Fourth, Josh already stands to suffer in myriad ways for his actions.  Due to his felony conviction, there are numerous collateral consequences he must already face.  *See* Michael Pinard, *Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity*, 85 N.Y.U. L. REV. 457, 459 (2010) (ineligibility for federal welfare benefits, public housing, student loans, and employment opportunities, as well as various forms of civic exclusion, such as ineligibility for jury service and possible felon disenfranchisement).  Given the nature of Josh's current business – which under ordinary circumstances could involve contracting with government and not-for-profit entities – he fears that the fact of his conviction alone is likely to slow the growth of the business.  For these reasons, and in addition to the obvious consequences Josh will face as a result of an incarceratory sentence, not the least of which is separation from his family, including his yet-to-be-born child, we respectfully submit that any incarceratory term will have a long term negative impact on Josh's life.  *See* Doug McVay, Vincent Schiraldi, & Jason Ziedenberg, Justice Policy Institute, *Treatment or Incarceration: National and State Findings on the Efficacy of Cost Savings of Drug Treatment Versus Imprisonment* 3 (2004) ("[T]he impact of a felony conviction may last a lifetime, and even a short period of incarceration has been shown to affect people's earnings and ability to get a job, to be parents, and to become productive parts of their communities.").

Fifth, the Court's sentence must "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).  Respectfully, we submit that it is not necessary to incarcerate Josh to ensure this objective. Josh's reputation has been destroyed; there is no doubt that his felony conviction alone will adequately deter him from committing any crimes in the future.  Such a

reality is highly relevant in assessing the appropriate sentence.  *See*, *e.g*., *Adelson*, 441 F. Supp. 2d at 514 (noting that, "[w]ith his reputation ruined by his conviction, it was extremely unlikely that [the defendant] would ever involve himself in future misconduct").  This case is not one in which the public faces any risk from the defendant.  Josh has no prior criminal history, was not accused of committing a violent crime, and is a first-time offender who has a long history of stable employment.

This is also not a case in which there is a need to provide the defendant with training or correctional treatment.  Josh is a highly skilled individual who has the intellect and entrepreneurial spirit necessary to support himself in society.  After being sentenced, and if given the opportunity to remain at liberty, he intends to continue the business that is generating steady income.  The Court therefore need not fashion a sentence focused on vocational training or correctional treatment

Moreover, that business alone is an important consideration for the Court.  Josh first began the business in spring 2017, around the same time of his guilty plea in this case.  Over the course of the following fifteen months the company has steadily grown and Josh is the key factor in its success.  To be sure, Jessica assists with the day-to-day operations, but it is because of his expertise that the business is able to be competitive.  *See* PSR ¶ 52.  If Josh remains free to continue to grow the business, he will be in the best position possible to begin to make restitution to the victims and support his growing family.

D.   **In the Alternative, to Achieve the Goals of Sentencing, the Court Should Consider Imposing a Sentence of Home Confinement and a Substantial Community Service Condition**

As set forth above, we respectfully submit that a term of probation is sufficient, but not greater than necessary to accomplish the goals of sentencing.  However, should the Court disagree,

we request that the Court exercise its discretion to consider a wide range of alternatives to the lengthy terms of imprisonment suggested by the Guidelines.

Pursuant to §3553(a), the Court is also free to consider "the kinds of sentences available," including substituting some of the period of incarceration with home confinement and community service. The wide endorsement of community service by both federal and state courts can be attributed to individual judges who recognize that it "is a burdensome penalty that meets with widespread public approval, is inexpensive to administer, produces public value, and can be scaled to a degree to the seriousness of crimes." Michael Tonry & Mary Lynch, *Intermediate Sanctions*, 20 CRIME & JUST. 99, 124 (1996). Similarly, a 2005 publication of the Administrative Office of the United States Courts described community service as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair – a 'win-win' proposition for everyone involved." In selecting an appropriate candidate to perform community service, the Probation Office recommends that courts "can use community service successfully . . . for offenders with personal and social stability, who are willing, motivated, and who have no history of violence." Administrative Office of the U.S. Courts, Office of Probation and Pretrial Services, *Court & Community Informational Series: Community Service* (2005). Needless to say, Josh fits that description perfectly.

Such a remedy is not merely abstract. Despite an advisory sentencing range of 46-57, months' imprisonment, in a recent case, a court imposed a sentence of a two-year term of probation with 500 hours of community service. *United States v. Warner*, No. 13-cr-731 (CPK) (N.D. Ill. Jan. 14, 2014). Following a determination that the defendant's history of good works, charitable donations, and positive contributions was exemplary, the court found that imprisonment simply was not a just and proper sentence in that case. In a financial fraud case, then Judge Gleeson in

the Eastern District of New York sentenced a defendant whose conduct led to a $110 million loss to community service:

> [N]othing should ever be out of bounds . . . and I conclude that a sentence that doesn't include incarceration is appropriate here. Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its nature, given your age and your physical circumstances. I don't think the goals of sentencing here require you to be incarcerated.

*United States v. Shamilzadeh*, No. 04-cr-1094 (JG) (E.D.N.Y. Apr. 1, 2008).

With respect to home confinement, such a sentence would permit Josh to remain a part of the family life and community of which he is an integral part, but would nonetheless constitute a substantial loss of liberty for Josh, and make clear to him and others that breaking the law has serious consequences.

Additionally, a term of home confinement will allow him to work for the community while still serving the goals and purposes of sentencing, including making restitution. As discussed above and in the PSR, since his arrest, Josh recently started a new company that is already generating meaningful revenue. He is resolved to earn as much as he possibly can so that he can make full restitution to his investors, as quickly and orderly as possible.

In fashioning a sentence, a court may consider how its sentence will affect the defendant's ability to make financial restitution. *See* 18 U.S.C. §3553(a)(7) (cataloging "the need to provide restitution to any victims of the offense" as one factor to consider in formulating a sentence). In *United States v. Peterson*, 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005), for example, the district court's central justification for varying from the guidelines was to facilitate the defendant's payment of restitution. 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005). The defendant had stolen

checks from his employer, forged signatures on the checks, and deposited them into his sister's bank account.  *Id*. at 1061.  He pled guilty to bank fraud in the amount of $81,000.  *Id.*  The district court elected to grant a variance from the advisory guidelines range of 12 to 18 months imprisonment and instead sentenced the defendant to "one day in prison, followed by a substantial period of community confinement as a condition of five years of supervised release."  *Id*.  In explaining its variance from the guidelines, the district judge said:

> If I had sentenced defendant consistent with the guidelines, he would have lost his job. This would have impaired his ability to repay the money he stole. I do not suggest that a defendant should receive a break just because he owes restitution. But in the present case, where defendant had a reasonably well-paying job and the restitution amount was manageable, §3553(a)(7) weighed in favor of a sentence that would allow him to remain in the community and working.

*Id.* at 1062.  As described above, as Josh's new business will likely falter in his absence, a non-incarceratory sentence in this case will put him in the best position possible to generate assets for restitution in order to make good on his obligations to his victims, as well as support his family. We most respectfully submit that a non-incarcerative sentence would maximize Josh's ability to make the restitution the victims are entitled to.

## CONCLUSION

Josh is a decent and hardworking man, with close ties to his family and community.  He has acknowledged his wrongful conduct and fully accepted responsibility.  For the reasons set forth in the record before the Court, we respectfully request that the Court impose a non-incarcerative sentence.


Dated: August 30, 2018                              BALLARD SPAHR LLP


By:  _____/s/ Marjorie J. Peerce_____
        Marjorie J. Peerce (*pro hac vice*)

1675 Broadway, 19th Floor
New York, NY 10019
Tel:  212-223-0200
Fax:  212-223-1942
peercem@ballardspahr.com

*Attorney for Defendant Homero Joshua Garza*