# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA        Criminal No. 3:17-CR-00158

    v.

HOMERO JOSHUA GARZA        September 6, 2018

## MEMORANDUM IN AID OF SENTENCING

Homero Joshua Garza, the defendant, lied to investors and customers and took their money. Although committed against the backdrop of virtual currency, the defendant's crime was nothing new or novel – he ran a Ponzi scheme. As a result, hundreds[1] of victims around the world lost their hard-earned money to their great detriment. Although the defendant primarily advertised and promoted his products on the internet, the victims were not large, nameless corporations, but real people who suffered tremendously as a result of the defendant's misconduct. In total the loss attributable to his misconduct was more than $9,000,000. The victims deserve justice, and the defendant should be sentenced consistent with the purposes of 18 U.S.C. § 3553(a).

## I. INTRODUCTION AND BACKGROUND

On July 20, 2017, the defendant appeared before the Hon. Donna Martinez, United States Magistrate Judge for the District of Connecticut, waived indictment, and pleaded guilty to a one-count information charging him with Wire Fraud, in violation of 18 U.S.C. § 1343. The defendant entered into a plea agreement that contemplated an advisory Guidelines range of 63 to 78 months' imprisonment.

---

[1] As of the filing of this memo, the Government has identified 191 verifiable victims who were willing to come forward. The evidence, however, suggests that there were thousands of investors and customers.

The defendant is currently scheduled for sentencing on September 13, 2018.

## II.    FACTS AND CIRCUMSTANCES OF DEFENDANT'S CONDUCT

The facts underlying the defendant's conviction are set out in detail in the plea agreement and Presentence Investigation Report, and adopted by the Government as follows.

From approximately May 2014 through January 2015, the defendant operated what was effectively a Ponzi scheme in three different phases related to the purported generation and sale of virtual currencies.

As described in the plea agreement, a "virtual currency" is a digital representation of a value that can be traded and functions as a medium of exchange. Virtual currency generally is not issued or guaranteed by any jurisdiction or government, and its value is decided by consensus within the community of users of the virtual currency. A virtual currency generally self-generates units of currency through a process called "mining." A virtual currency "miner" is computer hardware that runs special computer software to solve complex algorithms that validate groups of transactions in that virtual currency. Once a complex algorithm is solved, a unit of currency, such as a Bitcoin, is awarded to the individual operating the miner. This process is known as "mining."

The defendant was initially in the business of selling actual, physical "miners." In the spring of 2014, the defendant founded a company called GAW Miners and began operating a business to purchase virtual currency mining equipment from overseas manufacturers and resell it to customers.

The first phase of the defendant's scheme began when he shifted the focus of his company to what he called Cloud Hosted Mining. This was a service in which the defendant offered his customers the option of having another company founded by the defendant, called ZenMiner, house the miners, rather than ship them to customers. The customers could then login through a

2

website interface and purportedly control how they used their equipment to engage in mining. To attract business, the defendant falsely and fraudulently represented that ZenMiner was a completely separate entity that he did not own or create. To that end, on or about August 24, 2014, GAW Miners issued a press release announcing that its parent company (which was also owned and controlled by the defendant), had purchased a controlling stake in ZenMiner for $8 million, and that ZenMiner had become a division of GAW Miners. This statement was false – no such transaction occurred because the defendant had always owned and controlled ZenMiner. The statement was made to attract business. It did.

In late August 2014, the second phase of the defendant's scheme began. Facing a number of issues with the Cloud Hosting Mining Service, including that the defendant's companies did not have the mining capacity to satisfy customer demand, the defendant shifted again the focus of his business, this time to the sale of "hashlets."

As described in the plea agreement, a hashlet entitled an investor to a share of the profits that GAW Miners and/or ZenMiner would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers. In other words, hashlet customers, or investors, were buying the rights to profit from a slice of the computing power owned by GAW Miners and ZenMiner. The defendant advertised hashlets as such on his company's website and elsewhere, including by stating that hashlets would always be profitable and never obsolete and that "they will always make money." These statements were not true. By autumn of 2014, the defendant's miners were technologically obsolete and, as a result, his companies were no longer profitable. To hide this fact, the defendant applied money from new hashlet investors and used it to pay older hashlet investors as initially promised. In other words, investors were paid back

gradually over time with what were purportedly returns, but in fact were just funds that the defendant and his companies had collected from other investors. It was a Ponzi scheme.

During the late autumn of 2014, the third and final phase of the defendant's scheme began. As GAW Miners and ZenMiner began to run out of money to pay back hashlet investors, the defendant again shifted the focus of his business, this time to the sale of a new virtual currency called "PayCoin." The defendant and his company allowed his victims to convert hashlets to units of PayCoin. The defendant represented to prospective investors as well as his hashlet customers that the market value of a single PayCoin would not fall below $20 per unit because the defendant's companies had a reserve of $100 million that the defendant would use to purchase PayCoins to drive up its price. But no such reserve existed. He also promised that PayCoins would be broadly available for use at consumer stores such as Apple, Amazon and others. The defendant, however, never reached any such agreement with any company.

As with all Ponzi schemes, eventually the truth caught up with the defendant and his companies. The market value of PayCoin collapsed, and many customers lost everything they had invested.

## III. <u>SENTENCING GUIDELINES</u>

The Government continues to agree with the Guidelines calculation set out in the plea agreement, and now adopted in the PSR. The plea agreement states as follows:

> The defendant's base offense level under U.S.S.G. § 2B1.1(a)(2) is 7. That level is increased by 18 level, because the agreed-upon loss is over $3,500,000 but less than $9,500,000 per U.S.S.G. § 2B1.1(b)(1). That level is increased by 2 levels because the offense involved 10 or more victims per U.S.S.G. § 2B1.1(b)(2). That level is further increased by 2 levels because the defendant was an organizer, leader, manager or supervisor in the charged criminal activity per U.S.S.G. § 3B1.1(c). 3 levels are subtracted under

U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 26.

Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category I. The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate.

A total offense level 26, assuming a Criminal History Category I, would result in a range of 63 to 78 months of imprisonment (sentencing table) and a fine range of $25,000 to $250,000, U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of 1 to 3 years. U.S.S.G. § 5D1.2.

The Government and the defendant reserve their rights to seek a downward or upward departure or a non-Guidelines sentence below or above the Guidelines range, and both sides reserve their right to object to a departure or a non-Guidelines sentence.

## IV.    **RESTITUTION**

Restitution as set out in the plea agreement is as follows:

In addition to the other penalties provided by law, the Court also order that the defendant make restitution under 18 U.S.C. § 3663A, and the Government reserves its right to seek restitution on behalf of victims consistent with the provisions of § 3663A The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless otherwise ordered by the Court.

Regardless of restitution that may be ordered by the Court noted above, the defendant agrees to make restitution in the amount of $9,182,000. The defendant agrees to make such restitution as ordered by the Court.[2]

---

[2] Although the defendant has agreed to pay this amount in restitution, exactly which victim is owed what specific amount of money has not yet been ascertained. Therefore, the Government respectfully requests an additional 90 days prior to the Court entering a restitution order in this matter. 18 U.S.C. § 3664(d)(5).

## V. <u>SENTENCING FACTORS</u>

After the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-245 (2005) rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a).

The Second Circuit reviews a sentence for reasonableness. *See Rita v. United States*, 127 S. Ct. 2456, 2459 (2007). The reasonableness standard is deferential and focuses "primarily on the sentencing court's compliance with its statutory obligation to consider the factors detailed in 18 U.S.C. § 3553(a)." *United States v. Canova*, 412 F.3d 331, 350 (2d Cir. 2005).

### a. <u>Victim Impact and Nature and Circumstance of the Offense</u>

Any discussion of this case must begin with the enormous impact the defendant's misconduct has had on the victims. Victim impact speaks directly to the nature and circumstances of the offense, the seriousness of the offense, as well as to the importance of deterrence.

To date, the Government has collected and sent to the Court approximately two dozen victim impact statements. These letters make clear that the impact of this crime on the victims cannot be understated. Many victims are now destitute. Others are still working off loans that they took out to invest in the defendant's scheme. Lifesavings have vanished. Below is a summary of just a few of the letters the Court has already received:

- R.P. was a disabled veteran who had pancreatic cancer. He invested $25,000 with the defendant, his entire life savings. He hoped his investment would grow so that it could be used to take care of his family after he passed. While sick, R.P. learned that other investors were concerned about the viability of the defendant's companies. He wrote to the defendant, asking him about the concerns. The defendant told him to stick with his company, and R.P. did. He lost everything he had saved up until that point. He died at the age of 34 in 2015. His family not only did not have the benefit of an investment, but they lost the initial $25,000 R.P. had saved for them.

- L.F. invested both his money as well as money belonging to his landlord. In total he invested approximately $45,000, all of which was lost. He was forced to live in his car.

- L.H. and his wife, relying on the defendant's promises, invested in hashlets by taking out a loan. They also lost their investment. To repay the loan, they have

been forced to take out a home equity line of credit, empty one of their 401(k) accounts, take out a loan secured by L.H.'s truck, as well as another unsecured loan. They are still in debt and live now paycheck to paycheck.

- J.B. is a Swedish citizen who made money mining virtual currency. When J.B. learned about hashlets, he was going through a hard time – his wife was out of work due to an injury. Mining was a way for him to earn a little extra income for his family. He took out a loan to invest in hashlets and withdrew some money over time. Later, he heard about PayCoin and that the value of PayCoin would not go below $20 per coin. He took out another loan and invested further in PayCoin. He lost his investment. To this day, he and his family are still dealing with the consequences of his indebtedness.

- L.C. is a U.K. citizen who invested with the defendant. He lost a large number of Bitcoin as well as $12,000. After he lost his investment, he was unable to help take care of his ailing father who suffered and then died from Alzheimer's.

- S.S. is a citizen of Australia who invested all of his savings with the defendant. After the scheme unraveled, he separated from his wife due to the financial hardship he faced. He now suffers from cancer and does not have the means to fight it as he otherwise would if he had not lost his money investing with the defendant.

- P.G. is a U.K. citizen who invested €20,000 with the defendant based on the promise of significant returns. This was money that was supposed to get him through university. It also was lost, and P.G. ended up delaying his education.

The tales of loss go on and on. R.G. invested with the defendant's companies and was unable to pay back money he owed on real estate. He will be paying back interest for the next ten years.

8

J.R. was a 66-year-old who lost approximately $10,000. O.A. invested the last of the money he inherited from his mother into PayCoins with the understanding that they would be used at retail stores like Target. J.K. was a cryptocurrency reporter who both lost money and suffered significant reputational damage because she reported on the defendant and his various companies.

The defendant is responsible for the suffering of these victims. And the victims are entitled to justice.[3]

Beyond the impact on the victims, the Court should also consider the scheme itself in fashioning an appropriate sentence. The offense conduct here lasted nine months. This is not a case where the defendant made a single mistake or exercised bad judgment on an isolated occasion. Instead, the defendant became aware that his business faced difficulties as early as August of 2014. Rather than own up to those difficulties, the defendant shifted the focus of his business on two separate occasions. First, he began selling hashlets to virtual currency investors around the world. By November 2014 it became clear that he had sold too many hashlets, (*i.e.* more computing power than he could provide to his customers), so he offered his hashlet customers an option to convert their investment into PayCoins. He made promises about PayCoin's floor as well as where it would be accepted. None of them were true. This was a deliberate, calculated decision. At any step along the way the defendant could have given up the façade. Instead, he doubled-down on it.

Finally, the breadth of this fraud is astounding. There are victims around the world – as far as Europe, Australia and South America. The loss amount here exceeded $9,000,000, which was taken not from nameless anonymous people on the internet, but real people who are still

---

[3] The Government understands that one victim will be attending the sentencing and plans on addressing the Court.

suffering as a result of the defendant's misconduct. The Court should consider these facts as it weighs an appropriate sentence in this matter.

### b. General Deterrence

General deterrence is another factor the Court should consider in fashioning a sentence here.

> White-collar crime is believed to be particularly amenable to deterrence due to its rational and profit-oriented motivation. In a conceptual analysis of the topic, Braithwaite and Geis observed that white-collar offenders are not committed to a lifestyle of illegality, are risk aversive, and have more to lose as a result of a criminal conviction than street offenders. . . . Most judges and prosecutors view general deterrence as the one of the goals, if not the major purpose, in sentencing white-collar offenders. Punishment should serve to discourage others from committing similar offenses[.]

Elizabeth Szockyj, "Imprisoning White-Collar Criminals?" from "Symposium: A Fork in the Road: Build More Prisons or Develop New Strategies to Deal with Offenders," 23 S. Ill. U. L.J. 485, 492 (1999) (footnotes omitted). For this reason, "Congress has recognized that general deterrence is particularly important in the context of white collar crime." *United States v. Sample*, -- F.3d --, No. 17-2086, 2018 WL 4056013, at * 4 (10th Cir. Aug. 27, 2017) (citing S. Rep. No. 98-225, at 76, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. *This is particularly important in the area of white collar crime.*") (emphasis added)); *see also United States v. Cutler*, 520 F.3d 136, 162–63 (2d Cir. 2008) (similar).

Here, not only is general deterrence important because the victim perpetrated a white collar offense, but also because the offense happened in the context of virtual currencies. Bitcoin and other virtual currencies are still relatively novel. While there have been prosecutions related to various bad actors on the dark web that involved the use of Bitcoin, there have been relatively

few white collar prosecutions in the virtual currency arena. This case in particular has generated significant media interest in virtual currency communities. *See, e.g.*, Rizzo, Pete, *Garza Pleads Guilty: GAW Miners CEO Cops to $9 Million Fraud*, Coindesk, *at* https://www.coindesk.com/garza-pleads-guilty-gaw-miners-ceo-cops-9-million-fraud/ (Jul. 20, 2017). The Court has an opportunity to send other would-be cryptocurrency fraudsters the message that this sort of misconduct is *not* tolerated. *Sample*, 2018 WL 4056013, at *4 ("White collar criminals may be particularly susceptible to general deterrence because defendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment.") (internal quotation marks and modifications omitted).

### c. <u>History and Characteristics of the Defendant</u>

The defendant appropriately spends most of his sentencing memorandum detailing his history and characteristics. And to be clear, the Government does not take issue with much of what the defendant says about himself. For instance, the Government has no reason to doubt that the defendant had a troubled childhood. Similarly, the Government understands that the defendant now has a successful, albeit new business, the profits from which the Government expects will be used to pay restitution to the victims in this matter. These are factors the Court can and should appropriately consider and weigh in crafting a just sentence.

Although the defendant also accepts responsibility for what he did and the pain he caused his victims, it is nonetheless worth highlighting for the Court some of the ways the defendant spent his money while lying to investors about the products his companies provided. For instance, during the pendency of the fraud, the defendant drove various high-end vehicles, including a Ferrari, Lamborghinis, and a Maserati. The defendant also went to Las Vegas in October of 2014

11

in a private jet and, while there, spent $30,000 at night clubs, rented a Hummer Limousine and multiple hotel rooms on the strip. This is, for context, around the same time R.P. was battling pancreatic cancer and looking for a place to invest his life savings so his family would be taken care of after he passed.

Later, in April of 2015, the defendant traveled to Dubai. Notably, this last trip was after the complete collapse of PayCoin – by then it was clear that the defendant's business was a sham. Rather than put aside money for his victims, the defendant charged more than $100,000 to his credit card at his hotel in Dubai.

However much the defendant has changed since he committed this crime, the Court should not lose sight of the fact that while victims like R.P. and others invested everything they had with the defendant in reliance on his misrepresentations, the defendant spent their money extravagantly.[4]

Finally, the defendant argues that his new job is a justification for a non-incarcerative sentence. The defendant's job and ability to pay restitution are factors the Court can consider in fashioning an appropriate sentence. It cannot by itself, however, justify a non-incarcerative sentence. *See Sample*, 2018 WL 4056013, at *4 (holding that "[o]ur system of justice has no sentencing discount for wealth" and reversing a district court's sentence as substantively unreasonable where the court departed from a range of 78 to 97 months to a sentence of probation where the district court, in addition to the defendant's earning capacity cited the defendant's lack of serious criminal history, his conduct on pretrial release, his acceptance of responsibility, and the likelihood the defendant would not offend again).

---

[4] The Government does not dispute that a lot of the money went back to investors as well as to the costs of operating his business as well.

### d. **ABA Guidelines**

Lastly, the defendant spends significant time criticizing application of the § 2B1.1. loss table in economic crime cases in his Sentencing memo. The defendant asks that the Court apply the 2014 American Bar Association Task Force Report Guidelines ("ABA Guidelines") to calculate an appropriate sentencing range instead. *See* Def't Ex. C.

The Sentencing Guidelines, however, are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), and district courts must therefore treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings." *Id.* at 50.

Assuming, however, that the Court were inclined to agree with the defendant and apply the ABA Guidelines in an effort to more accurately calculate an appropriate sentencing range, the Government respectfully submits that the appropriate range would be 57 – 71 months, which is near the Sentencing Guidelines range to which the parties agreed in the plea agreement.

Under the ABA Guidelines, the Government agrees with the defendant that the offense level would begin with a base offense level of 7. That level would then be increased by 10 based upon the loss amount.

The defendant's culpability, however, should be characterized as high, and therefore warrants at least 3 additional points. This is based primarily on both the duration of the offense, nine months, as well as the degree of sophistication necessary to perpetrate the fraud. *See* Def't Ex. C at 7 ("Criminal undertakings involving a high degree of sophistication and/or organization generally reflect a greater threat of harm and a higher level of culpability."); *id.* ("Criminal undertakings that extend over several months or longer suggest a greater degree of culpability[.]").

The defendant also did not take any steps to mitigate the harm he caused his victims. To the contrary – he traveled to Dubai as discussed above after his scheme fell apart. *Id.* at 8.

The victim impact in this case should also be characterized as high and warrants an additional 6 points. Based on the impact statements submitted to the Court, there is no question that the losses threatened multiple victims' financial soundness. *Id.* at 9 ("Where the victim suffers losses that threaten the victim's financial soundness, this generally indicates a higher degree of victim impact."). Indeed, the victims here were individuals, not corporations. *Id.* Many victims have also suffered significant non-economic harm as described in the letters submitted to the Court as well. *Id.*

Finally, 2 levels are added for the number of victims and 3 levels are subtracted for acceptance of responsibility. This results in a total offense level, calculated using the ABA Guidelines, of 25, which, given the defendant's criminal history category yields a Guidelines' range of 57-71 months.

## VI. <u>CONCLUSION</u>

In sum, the defendant perpetrated a $9,000,000 fraud that impacted hundreds of victims around the world. He should be sentenced consistent with the aims of 18 U.S.C. § 3553(a).

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

_____/s/_____
JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv07973
157 Church Street, 25th Floor
New Haven, Connecticut 06510
Tel: (203) 821-3735
John.Pierpont@usdoj.gov

<u>CERTIFICATION</u>

I hereby certify that on September 6, 2018, a copy of the foregoing was filed electronically with the court and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

_____/s/_____

JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY