UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA         :    No.  3:17CR158(RNC)
                                :
            vs.                  :
                                :
HOMERO JOSHUA GARZA,             :
                                :    HARTFORD, CONNECTICUT
                Defendant.       :    SEPTEMBER 13, 2018
                                :
- - - - - - - - - - - - - - - - x


SENTENCING


     BEFORE:

          HON. ROBERT N. CHATIGNY, U.S.D.J.



APPEARANCES:


     FOR THE GOVERNMENT:

          U.S. ATTORNEY'S OFFICE
          157 Church Street
          P.O. Box 1824; 23rd Floor
          New Haven, Connecticut 06510
          BY:  JOHN TROWBRIDGE PIERPONT, AUSA


     FOR THE DEFENDANT:

          BALLARD SPAHR, LLP-NYC
          919 Third Avenue
          New York, New York 10022
          BY:  MARJORIE J. PEERCE, ESQ.


                              Darlene A. Warner, RDR-CRR
                              Official Court Reporter

1                          10:05 A.M.

2

3              THE COURT:  Good morning.  This is the

4    sentencing hearing in the Garza case.  Would counsel

5    please state their appearances.

6              MR. PIERPONT:  Good morning, Your Honor,

7    Assistant United States Attorney John Pierpont on behalf

8    of the United States.  Joining me at counsel table is

9    Special Agent Mark Munster with the FBI.

10             THE COURT:  Good morning.

11             MS. PEERCE:  Good morning, Your Honor, Marjorie

12   Peerce, Ballard Sparh admitted pro hac vice in this

13   matter, and sitting with me is Mr. Garza.

14             THE DEFENDANT:  Good morning.

15             THE COURT:  Good morning.

16             Mr. Garza appears for sentencing this morning

17   having pleaded guilty to wire fraud.  Our probation office

18   has prepared a presentence report.

19             Ms. Peerce, can you confirm that you have

20   received and read the report in full?

21             MS. PEERCE:  Yes, Your Honor, including the

22   addendum which was provided the end of August, and I have

23   reviewed them with Mr. Garza.

24             THE COURT:  All right, thank you.

25             Mr. Garza, addressing you directly, can you

1    confirm that you have received and read the presentence

2    report?

3                    THE DEFENDANT:  Yes, Your Honor.

4                    THE COURT:  And reviewed it in detail with

5    Ms. Peerce?

6                    THE DEFENDANT:  Yes, Your Honor.

7                    THE COURT:  Are you satisfied that you've had

8    enough time to do that?

9                    THE DEFENDANT:  Yes, Your Honor.

10                   THE COURT:  Is the report accurate?

11                   THE DEFENDANT:  Yes, Your Honor.

12                   THE COURT:  All right, thank you.

13                   Ms. Peerce, do you have any objection to any of

14   the statements of fact in the report?

15                   MS. PEERCE:  I do not, Your Honor.

16                   THE COURT:  Thank you.

17                   Mr. Pierpont, does the government have any

18   objection to any of the statements of fact in the report?

19                   MR. PIERPONT:  It does not, Your Honor.

20                   THE COURT:  Thank you.

21                   I adopt the statements of fact in the report in

22   the absence of objection.

23                   PROBATION OFFICER:  Yes, Your Honor.

24                   THE COURT:  With regard to the application of

25   the Sentencing Guidelines, the parties have agreed upon a

1    guideline calculation which conforms to the calculations

2    set forth in the report.

3           We start with a base offense level of 7, 18

4    levels are added because of the amount of the loss, two

5    more levels are added because of the number of the

6    victims, and an additional two levels are added because of

7    Mr. Garza's role in the offense, resulting in an adjusted

8    offense level of 29.  Mr. Garza receives a three-level

9    reduction for his acceptance of responsibility, and so we

10   have a total offense level of 26.

11          Mr. Garza has no prior criminal convictions nor,

12   to my knowledge, any prior involvement in the criminal

13   justice system, and so he is in Criminal History Category

14   I under the guidelines.  A person with a total offense

15   level of 26 in Criminal History Category I has an advisory

16   guideline range of 63 months on the low end to 78 months

17   on the top.

18          In addition, the guidelines suggest a sentence

19   of supervised release of anywhere from one to three years

20   to follow any term of imprisonment and a fine of anywhere

21   from $25,000 to $250,000.

22          Can we agree that I have correctly stated the

23   applicable Guideline range?

24          MS. PEERCE:  Yes, Your Honor.

25          MR. PIERPONT:  Yes, Your Honor.

1          THE COURT:  Thank you.  I adopt that.

2          Both parties, the government and Mr. Garza, have

3   submitted papers to me in advance of today, which I have

4   read.  In addition, I have received a number of letters,

5   some supporting Mr. Garza in his request for leniency

6   today, some from victims seeking a stern sentence.

7          I have read those letters as well, and I trust

8   that counsel have received and read those letters.

9          MS. PEERCE:  Your Honor, we believe we've

10  received all of the letters that were provided to the

11  Court.

12          THE COURT:  All right.

13          MR. PIERPONT:  That's correct, Your Honor, and

14  the government has received all of the letters that were

15  attached to Mr. Garza's sentencing memo and has reviewed

16  those.

17          THE COURT:  All right, fine.

18          Mr. Garza, I understand that you have read the

19  victim impact letters?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  All right, thank you.

22          You're welcome to make whatever additional

23  presentations you wish this morning.  My intention is to

24  give you an opportunity to make whatever presentations you

25  wish and then we'll be taking a recess before I proceed to

1    imposing a sentence.

2            Mr. Garza, you submitted a letter which I have

3    read.  You have a right to speak this morning if you wish

4    to do so.  You are under no obligation to say anything,

5    but the law gives you a right to speak on your own behalf

6    if you want to, all right?  That will be entirely up to

7    you.

8            MS. PEERCE:  Yes, Your Honor, Mr. Garza does

9    intend to speak to the Court at whatever time the Court

10   would find appropriate.

11           I do have some additional remarks.  I don't know

12   whether Your Honor wants to hear from me first, the

13   government first.  I know that there is a victim in the

14   courtroom who wishes to speak.

15           I would request that Mr. Garza be the end, if

16   that's possible.

17           THE COURT:  All right.

18           MS. PEERCE:  So that he can accurately react to

19   what he's heard in this courtroom.

20           And also Mr. Garza's father-in-law, who is in

21   the courtroom and who did submit a letter to the Court,

22   would also like to speak, if that is acceptable to the

23   Court, and he is sitting here in the courtroom.  And so if

24   that would be possible, his name is Allen, I would prefer

25   not putting the last name on the record.

1             MR. PIERPONT:  Your Honor, I'm sorry, before we

2       get to the presentation, I would like to make a note about

3       restitution in this case, which is that restitution is

4       mandatory in this case and the parties have agreed to a

5       restitution amount of around $9.1 million.

6             The government is still working with the victims

7       to figure out who is owed what amount.  I understand there

8       is a provision I believe in the sentencing memo, the

9       government cited it, specifically, 18

10      USC Section 3664(d)(5) in which upon, I don't even think

11      it's a motion by the government, I think it's notice

12      provided by the government, an additional 90 days can be

13      provided for a restitution order to be entered in this

14      matter.

15            So maybe before we get to the presentations, I

16      would ask for the additional 90 days so the government can

17      make sure restitution is fully in order before an order is

18      entered.

19            MS. PEERCE:  Your Honor, we join in that motion.

20            THE COURT:  The motion is granted.

21            I would like to learn more this morning about

22      who lost how much and when.  I realize that most you can

23      provide would be estimates, and that's fine; but the

24      government has described the offense conduct as comprised

25      of three phases, and it would be helpful for me to know

1    how much of the loss would be attributed to each of those

2    phases, roughly speaking.

3                MR. PIERPONT:  Yes, Your Honor.

4                THE COURT:  In terms of the order of the

5    presentation, I think it might be best if I heard first

6    from the government, and the government may wish to

7    present a victim impact information to me and call any

8    victims who wish to be heard this morning before I hear

9    from the defense.

10                MR. PIERPONT:  Yes, Your Honor.  The government

11    is happy to proceed that way.

12                There is a victim representative here.  His name

13    is Allen, his last initial is S, and he would like to

14    address the Court.

15                I can tell you he has been speaking to a lot of

16    victims.  He has been a part of a civil lawsuit that has

17    proceeded initially against Mr. Garza and another

18    individual and it's now just against that other

19    individual.

20                So I suspect, Your Honor, he's going to be able

21    to speak directly to victim impact in this case, not just

22    his own, but also a handful of other people who have been

23    in touch with him.  I understand he has supporting

24    documentation with him as well to the extent that that

25    would be helpful for the Court to see.

1            So why don't we begin there.  I'll ask

2     Mr. Shinners to come up.

3            SPEAKER:  Good morning, Your Honor.

4            THE COURT:  Good morning.

5            SPEAKER:  As Mr. Pierpont has already stated, I

6     have handed him a package about this large, most of which

7     are supporting documents for what I'm about to say.  They

8     are from other victims.  They comprise emails and there

9     are other documents that are in support of what I'm about

10    to say, and if you have questions about the -- I know that

11    Mr. Pierpont is probably going to try to address how these

12    phases of losses were incurred by the victims, but you can

13    ask me these questions as well if you wish to.

14            So I'll begin, if it's okay with you, Your

15    Honor.

16            THE COURT:  Yes.

17            SPEAKER:  As I stated, I've already submitted a

18    victims' statement to you, and it also was rather large.

19    Some of the stuff that I'm going over today is a little

20    bit repetitive, but I've added other people to it.  So I

21    have to be cognizant not to say their first and last name

22    together, which I was not aware of prior to coming here.

23            As the impact statement already outlined that I

24    submitted, I'd already started in crypto world as a miner

25    with hardware, not the virtual products that Mr. Garza has

1    sold through GAW Miners.

2            Cloud mining service at the time was relatively

3    new.  There was a company called Genesis Mining.  They had

4    contracts where you were fundamentally leasing their

5    hardware.  You didn't own it, it wasn't forever.  Usually

6    the contracts were for a year period.  But the problem

7    with these types of contracts with Genesis was that they

8    had other constraints with the contractual aspects of them

9    where the -- if it became uneconomical for the miner, per

10   se, the individuals leasing, if it was uneconomical to

11   continue mining with that, in other words the costs had

12   exceeded the daily gain, then Genesis Mining retained the

13   right to terminate the contracts.  So this was a major

14   negative for anybody in the mining world to really go

15   into.  This was not really that advisable.

16            In good times it works well, but as we've seen

17   here recently in the last year or so, or the last six

18   months to a year, you know, crypto goes up and down

19   dramatically by, and by dramatically, astronomically.  The

20   price moves could be very astronomical.

21            So you could find yourself five, six months into

22   a Genesis contract and have it terminated because it's no

23   longer profitable because crypto, Bitcoin, for example,

24   has taken a depreciating curve on the price.

25            THE COURT:  Can you give me a sense of what the

1     rent would be under that lease?

2              SPEAKER:  I'm glad you brought that up actually.

3              The other aspect of the Genesis Mining contract

4     was when you really sat down to do the mathematics behind

5     the pricing model, more often than not, if you were lucky

6     enough to last the whole year in the contract, you might

7     break even in most cases.

8              So they were priced at a projection of what that

9     much mining power would yield over the course of a year.

10    And that was another argument, or complaint I should say,

11    with the consumers out there in the mining world that

12    often these contracts were not profitable to get into.

13             So this is what we had out there as a cloud

14    mining alternative to owning hardware.  And hardware,

15    which is what I started off with initially, has its own

16    set of problems.

17             A, you're paying for a lot of electricity.

18    These machines, whether you've built them yourself or

19    whether you purchased them from companies like Bitmain,

20    they produce an immense amount of heat.  So if you live in

21    a northern state, that's advantageous during the winter,

22    in the summer, not so much.  The heat can be very -- can

23    get out of hand.  And so subsequently what happens is is

24    that you have to augment your air conditioning in order to

25    accommodate the excess heat.  So it's -- it has its own

1    problems.

2         And this is an attractive part of what GAW

3    Miners was really promoting in a marketing manner was

4    that:

5         A, they were not like Genesis Mining, they were

6    a company that promoted their products as always

7    profitable, never obsolete, no heat issues, the daily fees

8    associated with these -- I want to call them contracts,

9    but the SEC has deemed them to be unregistered securities,

10   so we'll just go by the marketing aspect of what was

11   promoted.  The cost to own these things on a daily basis

12   was competitive against his competitor, which would be

13   Genesis Mining.

14        So there were all the attributes that, to put it

15   bluntly, was a no-brainer to most people.  If you can get

16   out of the hardware, get away from the hardware, save on

17   the heat, not have a six or seven, 800 thousand,

18   5000-dollar monthly electric bill every month and have it

19   all operated and managed by somebody else or hosted, you

20   know, it's -- it literally was a no-brainer.

21   Unfortunately it didn't turn out to be as legitimate as

22   everybody had hoped and this is where we're at today.

23        Did that answer your question a little bit?

24        THE COURT:  Yes.

25        SPEAKER:  Very good, thank you.

1           So I covered most of my first page just from

2     that conversation alone.

3           I wanted to address, which you asked a question

4     about this earlier, I don't know what John Pierpont has as

5     far as his supporting documents.  But as he stated, I was

6     the organizer of the civil litigation that should be

7     litigated here actually in this court building, I think,

8     against his partner.

9           One of the things that we had to do obviously

10    was to determine the total number of accounts that were

11    with GAW Miners through what we call Zen Cloud, the cloud

12    mining platform for GAW Miners.  The other database we

13    have is called Paybase which represents the Paybase

14    exchange and through which they sold PayCoin at $20 per

15    PayCoin.

16          We have both of these databases.

17          We have an expert database analyst who has

18    reconstructed the databases and the primary information

19    that I needed from him was roughly -- and I knew some of

20    this information prior to his work -- roughly total number

21    of accounts active, total number of true accounts, meaning

22    people that were actively trading or actively purchasing

23    more than one Hashlet, more than one contract, if you

24    will, or whatever we want to call it today, there were

25    over 200,000 active accounts in the Zen Cloud database.

1    The number was closer to 275, but 200,000 was a good basis

2    before -- at this point in time until we start taking away

3    more of the one Hashlet accounts that really was

4    superfluous.

5              Of this 200,000, 20,000 plus accounts were

6    highly active, meaning they weren't just two of these

7    units, two of these products, they were many products,

8    many of the same product of varying types, varying models,

9    so there were over 20,000 truly active accounts where

10   people prospectively lost money.  That would be the base

11   that we would determine the list of victims who lost

12   money.

13             Now, granted, from my own experience and my own

14   exposure to this information, early, back in 2014 and

15   2015, there were people that did make money, but as we are

16   calling this a Ponzi of sorts, you know, the early

17   adopters are the ones who generally make a profit out of

18   this, and the people in the middle and at the end, they

19   lose the most money.  So we were in the process of

20   determining that.  "Who lost what and by how much?"

21             One of the problems with the GAW Miners platform

22   and GAW Miners itself, is they did not perform KYC and AML

23   procedures in Zen Cloud to the level one would warrant for

24   a financial institution or a company that's operating with

25   finances.  And because of that, all we have are email

1    addresses, for the most part, to contact these people.

2              But when I was forming or organizing the class

3    action which is pending, I was exposed to an immense

4    number of communications obviously.  A lot of people were

5    very upset, they remain upset today.  I received thousands

6    of emails and many, many -- I don't even know how many

7    calls I have, I had a lot of calls and a lot of conference

8    calls and Google hangouts which is like a video chat

9    platform.  Just an enormous amount of communication.

10             And of these people, initially we established a

11   website just to gather interest to find out how many

12   people were willing to support a group lawsuit.  Of that,

13   over 500 people had registered.  And then we went into

14   phase two with a new website where each prospective victim

15   had to submit proof of loss, which included at the time

16   their account downloads from Zen Cloud, which we received

17   in total 173 victims who showed proof that they had lost

18   the amount that they had stated initially.

19             And I will go through -- I can go through some

20   of these.  I've added to my previous statement to the

21   Court.  And I guess I'll just go straight to it, actually.

22             There are two individuals, and I've already

23   submitted these to you, Your Honor, and I'm just going to

24   go by the first name, Robert and Lee.  I think you have

25   those.

1        THE COURT:  Yes.

2        SPEAKER:  These two former investors are

3   probably a good example of some of the impact that these

4   investors had suffered through after this whole scheme had

5   imploded.

6        On Robert's, as you know, he was an air force

7   veteran, he was in his early thirties, and he was

8   terminally ill with pancreatic cancer, and he had

9   25,000 -- roughly $25,000 was invested into GAW Miners

10   with Hashlets.  And then as over time this investment was

11   morphing, as GAW Miners was morphing, what direction they

12   were going in, it became evident at some point to him, and

13   to many -- not everybody, but many -- that there might be

14   some significant risk going on now with everybody's

15   portfolios, their investments.

16        This $25,000 was intended for his family,

17   because he was already in stage four pancreatic cancer, he

18   knew that he did not have much longer to live; $25,000 was

19   intended to pay for his funeral expenses as well as help

20   his family transition from having a father and a husband

21   to not having a father and a husband and having to survive

22   on their own.

23        Once it became evident that there might be some

24   severe issues with the investment, according to the

25   documents I've already submitted to you, he had contacted

1    Mr. Garza about this asking advice whether to cut his

2    losses and at least hold, you know, some of the assets

3    that he had, you know, had invested for his family.  I

4    mean, there was no getting around this.  I mean, he had to

5    leave something.

6             Ultimately Mr. Garza -- and I already gave you

7    the communications with Robert -- Mr. Garza told him to

8    not sell off his assets or his investment, and this turned

9    out to be a catastrophe for that family because he lost

10   pretty much everything.

11            I will, for the sake of transparency, I will say

12   that the community, meaning the community that was -- that

13   were all victims of this company -- we did try to get a

14   collection.  We got a collection, and we had it delivered

15   to the ███████ family -- I'm sorry, I didn't mean to use

16   the last name -- to the family, but it wasn't $25,000, it

17   was far less than that.

18            And I've yet to be able to reestablish

19   communications with his son, so I don't know.  I know that

20   they left -- they had to leave the home that they were

21   living in, but I don't know how to get in touch with the

22   son, you know, who was communicating with me in the very

23   end.

24            So that's that example which you already have.

25            The other one is Lee, Wisconsin, and he became

1    homeless.  He had, I believe -- he had tens of

2    thousands -- 40 something thousand dollars in this of his

3    own money.  But what made it even worse, his landlady, who

4    was his girlfriend also, somehow he may have convinced her

5    that this was a good investment too.  She managed to lose

6    tens of thousands of dollars too.  That relationship

7    didn't last and he ended up homeless because of this

8    living out of a car and a shack behind the property where

9    he had some of his possessions stored.

10          His communications with me were very sporadic at

11   one point because he had to rely on the public library's

12   internet access in order to communicate with me.  So that

13   one you're already aware of, Your Honor, and I wanted to

14   add a few more.

15          This individual's name is Brett.  He sent an

16   email to me on March 24 of 2016 stating that he had

17   entered the bankruptcy process due entirely to his losses

18   from the GAW Miner scam.  Losses were $75,000, to $80,000.

19   Because of the bankruptcy, his credit is completely

20   crushed.  He is having difficulty just performing normal

21   things.

22          This is to be expected from somebody that's had

23   to file bankruptcy.  You just can't go back out there and

24   start at zero again and just expect to be treated the same

25   or be able to function -- people don't realize what it's

1    like to not be able to get a debit card or not to get a

2    credit card or even a checking account from a bank because

3    you filed bankruptcy, and it's really a difficult way to

4    live for a considerable period of time.

5           Another individual Chris is a 47 year old army

6    veteran who was medically retired.  I assumed what he met

7    meant by that was he was medically discharged.  Chris lost

8    $45,000 which was the entirety of his savings.

9           And then on July 26 of 2015, he communicated to

10    me that he was having doubts that he would be able to keep

11    his house which he had just purchased in December of 2014

12    based on what he believed was a very sound investment in

13    the GAW Miner products which turned out to not be the

14    case.

15           Another individual named Robert, this one is

16    probably a good example of what happens when you put all

17    your eggs into one basket and you don't really plan for

18    the future well and you don't plan for what may be on the

19    horizon.

20           Robert, who probably wouldn't want me to use his

21    name in this anyway, which is good that I'm only using his

22    first.  Robert estimated his losses to be initially around

23    $300,000.  Shortly after I commenced an effort to organize

24    a class action lawsuit, I was notified by others from the

25    defunct group, the community, from the company-run website

1    called Hashtalk.  The thing had pretty much dissipated by

2    then and they had shut the website down or the forum down

3    at that point.  But a large number of people reached out

4    to me from the community to let me know that Robert was in

5    a near fatal car accident shortly after he realized that

6    his losses were complete.

7            And what happened to him from this -- and I

8    don't want to mislead you here, all right?  But he's blind

9    in one eye, he's wheelchair bound and both of his legs

10   were crushed in the accident and he did not have his

11   $300,000 anymore.

12           So this is the example or the lesson, you know,

13   that has to kind of be taught and learned here in all of

14   this, is that, you know, you can't put all your eggs in

15   somebody else's basket and allow them fiduciary

16   responsibility over your future basically.

17           And because of Robert's situation and shortly

18   after this, he didn't have the funds to take care of his

19   medical necessities.  And I have to tell you, I did

20   receive an email shortly after this happened, he was not

21   psychologically sound at that point, and who could blame

22   him.  He had been hit twice, basically in the same year,

23   severely.  He lost all his money and then he almost lost

24   his life, and now he's stuck in a wheelchair because of

25   this -- not because necessarily of him, obviously not, but

1    he's not where he could have been had his money been kept

2    in his normal investments in the real world.  You know, he

3    might have been far better off and been able to afford

4    better, you know, rehabilitative treatments.  There's no

5    telling -- there's no way this will ever happen anyway

6    now.

7              There's this other individual as well, Jamie,

8    and from what I understand, Mr. Pierpont has another

9    example of this, and it's worth belaboring.

10             There were a number of individuals, and Jamie

11   was one of them, where they liquidated their 401(k)s, took

12   the penalties to do so and then invested the entire, you

13   know, what was left over from that into the GAW Miner

14   scheme and lost it all.

15             There was another individual who had a 401(k),

16   or kind of one, I don't know what they call them in

17   Ireland.  Same thing happened to him although he was

18   unemployed at the time, and so not only did he lose his,

19   you know, what the equivalence would be of a retirement

20   fund, he was unemployed, so he had no way to cover his own

21   expenses on a daily basis.  So that really threw a wrench

22   into his lifestyle obviously.

23             One of the other things that nobody really

24   addressed, which was kind of odd to me, is the KYC AML

25   issue.

1          There were teenagers that were spending their

2    money buying GAW Miner's products, they were financial

3    products, at least that's the way the SEC sees it, the

4    government sees it that way, I see it that way, and there

5    were kids that lost all their savings.

6          There was a young man in Indonesia -- we're

7    talking about other countries now, some of them are near

8    third world status -- his name is Ricky, lost $750 to GAW

9    Miners.  Ricky stated in an email dated November 12, 2015

10   that $750 is large money.  Well, it is for somebody in

11   Indonesia.

12         I have another minor, his name is Lucas.  He's

13   from Denmark.  He lost $175, but that's what he had.

14         The community knew he was a minor when he was

15   active on the forum, on the website, the forum, we knew he

16   was a minor, and he was very entrepreneurial.  He was a

17   very outgoing young man, he had a lot of business ideas,

18   he pursued a few of them while GAW Miners was still

19   around.  They had nothing to do with GAW Miners as far as

20   I know.  In a way, he was much more mature than his age,

21   but he was nonetheless a minor.

22         And I think, you know, we have to understand

23   that a lot of these people aren't like multimillionaires

24   who lost a million here, two million there, a couple

25   hundred thousand, where they have money, you know, this

1    money is easily recoverable or can be built back up

2    through, you know, business or something.  We have to look

3    outside the United States as well and we have to look at

4    how a hundred dollars is a lot of money to people in, say,

5    Northern India or Malaysia or Vietnam or China even today.

6            So with that, I had correspondence with a person

7    named Endra, I'm not sure if it's a male or female to be

8    honest, who states the loss of $800 to GAW is kind of a

9    lot of money in Malaysia, I assume where this person lives

10   in Malaysia.

11           So, in essence, what I did glean from the data

12   mining, the data harvesting, was we had basically victims

13   with as little as $100 and as much as $1.3 million.

14           We had two Wall Streeters who each lost about

15   $900,000 in this.

16           We had a decent number of individuals in the

17   $100,000 plus range, but short of a million, and we had a

18   lot of people in the 20, 25, 30, 35,000 dollar loss range;

19   and what we did in the beginning to try to help people to

20   recover what they could, through the charge back process,

21   a lot of people used credit cards.  It was not the success

22   I thought it would be.

23           I was a recipient of some intelligence that

24   indicated that Braintree, the PayPal processor, had about

25   $900,000 that they had still held back from previous

1      transactions, held back, and so there was a bit of a group

2      effort to try to get everybody through, that used credit

3      cards, to get everybody through the charge back process,

4      which turned out to be far more difficult than people

5      realized.

6                    A lot of these credit card agreements give you a

7      90 day window to charge anything back with good reason, of

8      course.  And I think the problem we had for most people

9      was that their charges or what they purchased was already

10     past the 90 days.  And also some banks didn't -- they

11     looked at these as investments at the time, which we know

12     now are -- they were fundamentally investments, like

13     securities, like bonds, like whatever, you know, in the

14     financial world, and a lot of the banks did look at these

15     things and said this is not a product sitting in your

16     living room, it's sitting in some ubiquitous warehouse

17     somewhere that's no longer functioning, and that's the way

18     they looked at it.

19                    So a lot of people did not get their charge

20     backs fulfilled, but we tried to get as many people

21     through that process to drain the Braintree fund as much

22     as possible to try to recoup losses as much as possible

23     for everybody that was still around looking for help, you

24     know, to do this.

25                    I wanted to address this one part, and it may be

1    a little bit outside the realm of this court, but I read

2    the statements that were out already in the crypto world

3    about Mr. Garza is repentant, he's very sad about what

4    happened, he's remorseful, he's all of these things.  I've

5    read these things myself.

6         Somebody sent these things to me and asked my

7    opinion on it, and I said, okay, this is fine.  I don't

8    care.  None of us do.  None of us really care at all.  And

9    the reason why is that we are talking about somebody who

10   perpetrated a massive fraud that damaged potentially

11   thousands of individuals, at least 9,700 individuals

12   suffered pretty decent losses, meaning depending on where

13   you live in the world what a decent loss really is in

14   dollar value.

15        This is not -- I can go -- I probably know more

16   than I should -- but I can go back in time and see what

17   transpired when it was already known that GAW Miners was

18   imploding.

19        Mr. Garza basically fled the United States to

20   Dubai and there's some support -- I have some supporting

21   documents I brought with me as well for this -- he had no

22   intention of coming back to this country.  He prepaid his

23   apartment rental for 15 months in advance.  That's not

24   somebody who is going there for 30 days or on vacation,

25   that's somebody who is fleeing the country.

1               If he had any remorse that his company had just

2       fundamentally destroyed a large group of people, in

3       general, had destroyed their investments, had destroyed

4       their 401(k)s, had put them in positions where, like the

5       Robert individual, where shortly after all this he had

6       gone down, he was in a near fatal car accident where now

7       he has no money to actually pursue rehabilitative medical

8       treatment.

9               These are -- these are not really outliers.

10      It's the core of this entire investment group.  A lot of

11      people could not recover from this.

12              And we're four years after the fact right now

13      and I'm still getting emails from these people stating

14      that they are really massively in the hurt from this

15      still.  And we understand, you know, that you shouldn't

16      put all your eggs in one basket, you know?  But they did.

17              And Mr. Garza has an exceptional talent at what

18      I call psychological marketing.  We had discussed this

19      several times on the phone.  We have had personal

20      conversations before, back in 2014, and I knew then that

21      this was not the best way to be selling these types of

22      products.  And we didn't really know, as investors, we

23      didn't really know whether we should believe the naysayers

24      out in the crypto community or whether we should put the

25      blinders on and continue through with the investing in GAW

1     Miners products.

2             The reason -- and I know that this might be a

3     bit hearsay or -- I don't know -- the reason Mr. Garza is

4     here today is not because he was remorseful.  He is not in

5     the United States because he was remorseful.  He's in the

6     United States right now because he needed the government

7     to get him out of Dubai after a group of investors --

8     which we knew about, we knew this was going on -- tried to

9     sue him in the Dubai court and won.  And the documents I

10    have brought with me will support this.

11            There were other behind the scenes tricks, if

12    you will, that Mr. Garza was trying to, you know, deploy

13    to avoid coming to the United States to face an SEC --

14            MR. PIERPONT:  Can I just have one moment,

15    please?

16            THE COURT:  Yes.

17               (Pause)

18            SPEAKER:  In either case, Your Honor, I'll leave

19    that where that is at.

20            So in the end, I'm going to go ahead and close

21    because I could literally go on for hours and hours on

22    this.

23            I think that to show any leniency for Mr. Garza,

24    I don't feel -- and I know the community does not feel --

25    that this should even be an option.  The damage is too

1    extensive.

2            Even if Mr. Garza could come up with

3    $9.2 million right now, that is not going to reverse the

4    damage that has already been done to many of these

5    individuals.  You can't undo the damage.  Money doesn't

6    make problems like this go away, you know?

7            If I got all my money back, it isn't going to

8    make much difference to what I went through after losing

9    the money to Garza back in 2014, 2015.  It's not going to

10   make go away all the problems I had to deal with for over

11   a year.

12           I'm one of the fortunate few in this large group

13   of investors because I had the ability to dig myself out

14   of this without having to go through bankruptcy to do it,

15   and my losses were not enough that I could not overcome

16   them with a lot more work, if you -- I'm self-employed,

17   so, I mean, I have the ability, to a degree, to help

18   myself, you know, get out of some of these kinds of

19   issues.  But I can't say that was the case for everybody

20   else, to be honest.

21           So I'm going to leave, you know, leave it with

22   what I've said so far.

23           Did you have any questions?

24           THE COURT:  I appreciate your statement, as I

25   appreciated your letter.  It's helpful to the Court.  I do

1     have just a couple of questions.

2              As mentioned earlier, the government describes

3     this offense conduct as encompassing three phases.  The

4     first phase involved the shift from the sale of currency

5     mining equipment hardware to cloud host mining.  With

6     regard to that phase, the first phase, the misconduct, as

7     described in the papers before me, centers on Mr. Garza's

8     misrepresentations that Zen Miner was a separate entity

9     from GAW?

10             SPEAKER:  Am I stepping on your toes if I answer

11    this?

12             MR. PIERPONT:  Please answer the Judge's

13    questions truthfully.

14             SPEAKER:  Okay, good.

15             To the best of my knowledge, and from the data

16    that I've accumulated over the last number of years, the

17    entire statement that Zen Miner was a separate company was

18    completely and utterly false from day one.

19             THE COURT:  And later, and I don't have the

20    specific dates, but still in this first phase, Mr. Garza

21    issued a press release stating that Zen Miner had been

22    acquired for $8 million, and that was not true.  That's

23    phase one.  So let's hold that and turn to phase two.

24             Phase two, according to the information

25    submitted to me, began sometime in August of 2014.  This

1    is when Mr. Garza shifted his focus to the sale of

2    Hashlets; and my understanding is that this shift occurred

3    because Mr. Garza did not have the mining capacity to

4    satisfy customer demand?

5           SPEAKER:  I'm sorry, I would chop that up a bit,

6    I would, and restructure that statement.

7           I would say that initially -- and from what I

8    was told by an ex-employee who actually oversaw all

9    that -- that initially they were going out and leasing

10   mining power from Chinese, from where ever it was

11   available, initially when they did not have that kind of

12   power to back up what their sales were, the sales that

13   were being accomplished at the time.

14          Then -- and I can speak to this to a degree

15   because I was in the community at the time -- Mr. Garza

16   and GAW Miners had purchased hardware from Bitmain, the

17   world's largest basic hardware manufacturer in the word, I

18   should say, that they did purchase hardware; however,

19   logistically, it was a problem for them because remember

20   what I was saying earlier about the reason why hardware

21   miners, people like me would be interested in a product

22   that GAW Miners was presenting or selling, is that we have

23   to deal with heat and the electricity and breakdowns and

24   services and, you know, trying to keep everything up and

25   running and not burning your house or your building down.

1          They ended up having the same problem

2     eventually, from what I understand from -- or not from

3     what I understand, from what I know from one of the

4     ex-employees, is that they were rolling banks of miners at

5     one point in their data center in Mississippi because of

6     the fact that the heat was so intense and they could not

7     keep the overall temperature down enough and, you know,

8     they were under heavy risk of losing machinery permanently

9     because they were so hot.  And they had installed AC units

10    and such to mitigate the overwhelming heat.

11         So now we're in the mid phase of Hashlets where

12    you have hardware there, Hashlet sales are still going

13    through the roof, but now your hardware constraint,

14    because only some of your hardware is able to be turned on

15    at any given moment, because if you turn it all on, the

16    heat just gets crazy and the machine starts shutting down

17    from being overheated.

18         So that was mid to late.

19         THE COURT:  In connection with this sale of

20    Hashlets, the government states that Mr. Garza advertised

21    that the Hashlets would always make money.  As it turned

22    out, by the fall of 2014, within a matter of a few months,

23    the scheme was failing, on to hide that fact, Mr. Garza

24    used money from new Hashlet investors to appease older

25    Hashlet investors, and that is why this is characterized

1    as a Ponzi scheme in this second phase.

2              Holding that to the side, I turn to the third

3    phase, which is described as the PayCoin phase.

4              Beginning in late autumn of 2014 when Mr. Garza

5    changed the focus to the sale of this new virtual currency

6    called PayCoin, he enabled customers to convert Hashlets

7    to units in PayCoin stating that the market value of a

8    unit of PayCoin would never fall below $20 because he had

9    a $100 million dollars in reserve to maintain the price.

10             So that's the third phase.

11             What I'm interested in knowing, to the extent

12   you can help:  Which of these phases generated the largest

13   number of victims and the greatest loss?

14             SPEAKER:  It would definitely be the Hashlets

15   stage.  And the reason why -- you can say that Hashlets

16   was the beginning and the middle and the end.  It was the

17   reason -- the main reason why all of these shifts were

18   occurring.

19             If you go back and you look at the historical

20   documents, the email chains, everything, it is obvious

21   that certain circumstances -- under certain circumstances,

22   certain conditions were prevailing that caused him to

23   shift his business model to remain in a form of

24   profitability that he felt that he wanted, you know, for

25   himself.

1          So, for instance, you know, the price of Bitcoin

2    was dropping fairly precipitously at the time.  So that

3    meant that his mining machines in the data center in

4    Mississippi were producing less and less and less.  So as

5    the Ponzi part comes into play, you've got Bitcoin prices

6    falling, those people out there who would be interested if

7    these mining products are going to lose more and more

8    interest because their daily expected yield is lesser and

9    lesser and lesser, okay?

10          So he's not selling a lot more Hashlets, his own

11   mine is producing less Bitcoin per day in value as far as

12   dollars go because Bitcoin price is falling.  This put a

13   squeeze on Garza.  And then he had to shift everything

14   because you can't claim when you sell these Hashlets that

15   they will always be profitable, they will never be

16   obsolete.  You can't make these claims when you're staring

17   at a situation where you cannot honor this at all.

18          But anybody that had been in the industry even a

19   year would have known this.  This is the thing.  This is

20   the big question mark.  Knowing this, why would you go out

21   there and purport that your products would forever be

22   profitable, would never be obsolete without some kind of

23   element of -- you have to buy this additional thing or

24   whatever, you know, to continue to make these things, you

25   know, profitable forever.

1           And once this was known to him that he needed to

2     make a change, that's when the ICO thing kicks in, the

3     PayCoin.

4           So what do you do?  You've got to, and I'm just

5     trying to think like a criminal here, but you've got to

6     stem the bleeding.  Like he stated to the Court, greed

7     will make you do things you normally would not do, you

8     know, in a normal world, and so he needed to stem the

9     losses because he wanted to maintain his lifestyle.  There

10    is no doubt about that.

11          However, you know, doing this, the way he chose

12    to do this was there was a lot of -- again, a lot of

13    psychological marketing that was being employed to create

14    a sense of urgency that would make the investors who

15    bought the Hashlets have to make a decision on whether

16    they were going to fundamentally release him from

17    obligation with always profitable, never obsolete, by

18    converting all of these Hashlets to Hashlet mining, which

19    led up to PayCoin, and then subsequently converting it to

20    HashStakers, which is where you deposit these PayCoin

21    after they come into existence, you deposit them, like a

22    certificate of deposit at a bank.  We're all familiar with

23    those.  You put them in there, you can't take them out for

24    90 days, 180 days, whatever the time may be, you can't go

25    in without some severe penalty, but you didn't even have

1      that option.

2              So we went from Hashlets to Hashpoint mining,

3      which was the basis of creating PayCoin.  We went to

4      PayCoin where they were selling them through PayBase at

5      $20 apiece.  Don't really know how many.  Probably not a

6      lot.  But they had an exchange there too.  PayCoin had a

7      product or an ICO, initial coin offering, basically if you

8      want to call it that, where the company guaranteed a price

9      for $20 apiece.

10             This is the bait and the hook part.  Because way

11     over here when we were all semi-content with Hashlets,

12     we're being told that, you know, we need to, you know,

13     mine basically HashCoins, it's your decision, but you have

14     until, you know, four days from now to make that decision,

15     or a week.  Not a lot of time to make that decision, not

16     knowing what that means, you know, in the future.  What

17     does it mean to me in the future this thing you're

18     proposing to me?  All right?

19             So now your mining HashPoints which will be

20     converted to PayCoin, but now you can't go back and mine

21     again.  You've made a decision to mine HashPoints, but you

22     can't go back and mine Bitcoin, or whatever you were

23     doing.  You're now there in some gray area and converting

24     to HashStakers.

25             You're going to take this PayCoin, you're taking

1    a PayCoin that's guaranteed to be $20 minimum, you're

2    sticking it in there, and you will earn inherent interest

3    rate that GAW Miners decides for set periods of time.

4            So that in and of itself was egregious, okay?

5    The whole transition of all of this was egregious enough

6    in the end.

7            What made it worse, really, the salt in the

8    wound, is that if you didn't have enough Hashlets, you

9    know, to convert to these little certificate of deposit

10   sleeves, if you didn't have enough of these, they were

11   selling them.

12           So not only were you paying eleven ninety-five,

13   I can't remember what all the price was for that, I think

14   it was eleven ninety-five per PayCoin slot.  Not only --

15   you know, you're buying a HashStaker, this little wallet

16   thing, and you're going to commit to PayCoin for up to 180

17   days in this thing.  You cannot remove.

18           So as you're an investor, watching the price of

19   PayCoin go from here to here to here and:  A, you cannot

20   remove the PayCoin from the wallet; B, you're now upside

21   down because you paid eleven ninety-five for the wallet to

22   begin with to put this coin into that you were supposed to

23   get an inherit rate of return on that doesn't make a hill

24   of beans difference when the price of PayCoin is no longer

25   one twenty, it's now one dollar or it's now 35 cents.

1            So you've paid eleven ninety-five, or whatever

2    the price was, and you're getting back in the end, 35

3    cents or less.  And this is the part, I think, we're

4    trying to, you know --

5            THE COURT:  To wrap up, I want to thank you

6    again, but just very briefly:  Do you know the date or

7    approximate date, when the individual referred to earlier,

8    Mr. P. with the pancreatic cancer, contacted Mr. Garza

9    seeking relief?

10           SPEAKER:  It would be in the document I

11   submitted with my initial victims' impact statement.

12           John, do you have it?

13               (Pause)

14           SPEAKER:  If I'm not mistaken, all of that was

15   from my PM, private messaging, in a forum called Get

16   Hashing.  And he contacted me there.

17           So when I printed those off in a Word document,

18   they don't have the little time tags on them.

19           I want to say that -- I'm going to base the

20   period of time as roughly April or May.  And the reason I

21   say that is because that was the period of time that we

22   started trying to gather money from people to help the

23   family out.

24               (Pause)

25           SPEAKER:  I would say that it would be in the

1    November timeframe that initially he spoke to Josh, yes.

2            THE COURT:  And the trip to Dubai, when was

3    that?

4            SPEAKER:  The trip to Dubai -- I'd have to go

5    back to my notes.

6            Sorry?

7            April into May, I believe.

8            Now, previous to that, he had taken a 30-day

9    unannounced trip to Belgium as well.  That was in I

10   believe February or March.

11           THE COURT:  Thank you very much.

12           SPEAKER:  Thank you.

13           MR. PIERPONT:  So, Your Honor, I think a lot of

14   the questions you posed to me at the outset, Mr. Shinners

15   has answered.

16           To be clear, the number of victims at this

17   point, and what the government did is because this was --

18   this did happen over the internet, there were people who

19   just signed up with email addresses -- the government had

20   the database that Mr. Shinners spoke about at the outset,

21   reached out to people via email, and required them if they

22   wanted to be a part of this process, not to be anonymous.

23   They had to provide their name and provide documentation

24   that would support what their claims were.

25           So ultimately we had, I think as of today the

1      number is 192 victims who are verified victims who came

2      forward and said, yes, I am a victim and, yes, here's the

3      documentation that shows what I've lost.  So we're still

4      working through restitution in terms of what to do.

5              But as was indicated, there was a database that

6      did indicate that there were thousands of individuals.

7      The reason the government hesitates to put a specific

8      number on it is although there were a number of unique

9      email addresses, there is always a de-duping question as

10     well, Your Honor.

11             So if you have one person who is using five

12     email addresses, we didn't want to count one person five

13     times.  So we're sort of in this amorphous thousands area

14     of people who did not come forward in terms of wanting to

15     be a part of this process.

16             I will just add a little bit about the nature of

17     the scheme here, Your Honor.  I think it's important to

18     understand -- and you see this teased out in the victims'

19     letters a little bit.

20             There are these three phases, and far and away,

21     the government believes, the most problematic phase was

22     the Hashlet phase of the investment process.

23             PayCoin, from the government's perspective --

24     and you heard from the victim representative just a little

25     while ago -- that it was an nuanced movement from the

1    Hashlets into the PayCoin in terms of, you know, saying

2    you no longer wanted to mine Bitcoin but you wanted to

3    mine this other product which would ultimately lead to

4    PayCoins, and there was sort of this locked wallet that

5    those PayCoins had to sit in.

6         But fundamentally, when the Hashlets were no

7    longer financially viable, which did happen in the

8    approximate fall time period of 2014, and that was when

9    the money started being applied from subsequent investors

10   to earlier investors to give their rate of return, you

11   know, the promises that were being made were that there

12   was $100 million reserve, that that reserve would be used

13   to make sure that a PayCoin never went below $20, and also

14   that they would be wildly available at retail stores, like

15   Amazon and Walmart and Target and other places like this.

16        And what that did in terms of the scheme was

17   sort of twofold, which is, first of all, it took away the

18   initial financial squeeze of having to pay people back on

19   their Hashlet investments, right?  Because rather than pay

20   them back on their Hashlet investments, they're now going

21   to start mining, taking their computing power, putting it

22   towards PayCoin with an eye towards ultimately getting as

23   many units of PayCoin as possible.  So people were no

24   longer taking as much out from their Hashlets as they had

25   previously.

1          And the second thing they did, and again there's

2     a victim letter that talks about this, is it opened it up

3     to maybe some of the less tech savvy investors as well.

4          So you didn't need to have an understanding of

5     mining to know that, hey, there is this virtual currency

6     that's going to be worth 20 bucks that I can use on Amazon

7     to do what I want with, you know, let me get in at the

8     ground floor to make sure I can get as many of those as

9     possible.

10          And I think that those misrepresentations are

11    important to keep in mind, especially as you go through

12    the victim impact letters, because what you see a lot of

13    in these victim impact letters are not only people

14    investing their own money, but they're taking out loans to

15    invest in these products as well.

16          And so a lot of the hardships that are currently

17    being faced are not just from losing money but from, on

18    top of that, taking out loans in order to further invest.

19          And again from maybe the perspective of somebody

20    who is looking at this prospectively and is not perhaps as

21    technologically savvy, this seemed like a pretty good

22    deal.  If you're taking out loans, Bitcoin loans or actual

23    currency loans, whatever it is to put into this, but at

24    the end of the day, I think that you heard that $11 was

25    what you could sort of buy into to get a unit of PayCoin.

1           You think about, you know, how much -- if I'm

2   taking out a loan to buy $11 for each one of those

3   PayCoins but it's never going to go below 20, well, I have

4   that nine-dollar window to pay back the loan along the

5   way.  And people did that.

6           And hindsight is 2020, Your Honor, and now I

7   think we understand what this was all about.  But I think

8   looking prospectively, looking at what Mr. Garza was able

9   to accomplish, Mr. Garza who all the way back in the

10  beginning of this scheme said, hey, I just bought another

11  company for $8 million -- well, that wasn't true.

12          When the companies are representing themselves

13  to have a hundred million dollars cash reserve that are

14  putting out these Hashlets that are profitable -- and by

15  the way, he's paying out money on those as well so they

16  appear to be profitable, but he's using other people's

17  invested money to do so.  Well this doesn't look like a

18  bad bet.

19          And if you couple that with the fact that these

20  were supposed to be used in places like Amazon and Target

21  and other retail stores, maybe it makes sense that you

22  take out the loan to do what you do.  Maybe it makes

23  sense, you know, for you to empty a 401(k) or divest some

24  of your 401(k) along the way.

25          I also want to just spend a moment on -- I think

1    the victim representative did a good job of putting a

2    little meat on the bones in terms of who was -- who the

3    victims are in this case.

4         But I don't want the lack of victims here to in

5    some way deceive Your Honor.  Because this is a case where

6    there are a ton of victims and a ton of victims who

7    expressed interest in coming here but couldn't afford to

8    come here, which is why Your Honor has the two dozen

9    letters that were submitted in advance to the sentencing

10   today.

11        I think sometimes the internet can be an

12   impersonal medium, and a lot of this was done across the

13   internet, but a part of what these letters demonstrate,

14   what the victim representative illustrated, is these are

15   not nameless people on the other side of the computer who

16   are just throwing money around that is money they have and

17   it's not a big deal.  These are real people who have

18   suffered tremendously as we've outlined in our sentencing

19   memo.

20        You know, another question you had asked was the

21   sort of amount of money that individuals were investing,

22   and far and a way, the vast majority of them were within

23   the $40,000 to $60,000, maybe even $20,000 to $80,000

24   range, of people who were putting their own money into

25   this.

1          There were some Wall Street types who invested a

2     lot of money.  There are a handful of people north of

3     $100,000 as well who invested.

4          But far and away the bread and the butter of

5     people who were investing what are very large amounts of

6     money for an individual but, sort of, in the aggregate are

7     small amounts.  The 20,000, 30,000; 60, 70, 80,000 as

8     well.

9          And the fact, Your Honor, that we were able to

10    go from those relatively small investments to what is, as

11    the parties agree, is at least a 9 million-dollar fraud, I

12    think speaks to the breadth of what we're dealing with

13    here, right?

14         This is not a case where, you know, it's a small

15    community of maybe five people who invest.  It's not a

16    small fraud.  It is a worldwide fraud where we're talking

17    about hundreds of verified investors, if not more, to the

18    tune of $9 million, and people from all around the world.

19    Victim impact letters from people from England, Sweden,

20    South America, Australia.  You've heard a couple of other

21    individuals as well.

22         There are a couple letters here, Your Honor,

23    that I think -- I'm not going to read them, but I would

24    just like to maybe put on the record a little bit of what

25    it is, some of the hardships that these victims faced as a

1    result of what happened here.

2          So there was a letter, Your Honor, submitted by

3    an individual named JB.  JB was an individual who was

4    making money mining, as we've heard about right now.  His

5    wife was out of work, he had an eight year old daughter,

6    he took out loans to invest in Hashlets, additional loans

7    to invest in PayCoins, the 20-dollar coin we talked about.

8    As a result, he ended up on a credit watch list in Sweden

9    and is having a difficult time to this day.

10         There is another individual, LH.  He was an

11   individual --

12         THE COURT:  Mr. Pierpont, with regard to the

13   person you just mentioned, in his letter he states that he

14   and his family have wound up at the Swedish Kronofogden.

15   What is that?

16         MR. PIERPONT:  I understand that to be a credit

17   watch government organization in Sweden.  I don't want to

18   say it's like a debtor's list, but it's some kind of mark

19   so he has a more difficult time moving forward, taking out

20   loans or getting credit extended to him.

21         THE COURT:  I see.

22         MR. PIERPONT:  That's a recurring theme, Your

23   Honor.  I think there was another letter from a person in

24   South America who ended up in the same situation too.

25         LH is another individual who now has loans --

1    again, he took out loans to buy Hashlets as well.  He now

2    has a home equity loan, an unsecured loan, a loan secured

3    by his truck, and his wife has emptied her 401(k) account

4    along the way.

5         As he says here, "We can no longer afford to

6    take vacations as we now live paycheck to paycheck."

7         MDC is another individual as well.  This is the

8    South American individual I spoke about who is on a

9    database of bank debtors based on the loans that he took

10   out too.

11        PG was an individual in the UK.  He had invested

12   around 20,000 Euros and they were supposed to support him

13   in the university.  He had to take some time off to do

14   that work in order to support himself as well.

15        The list, Your Honor, goes on and on.  I think

16   the point here that the government wants to make is this

17   is not, you know, a bank officer embezzling from a bank.

18   This is not somebody ripping off a nameless cooperation --

19   and again, not that those are good things to be doing, I

20   don't say that -- but maybe where the victim impact, Your

21   Honor, is less.  Here we're talking about the victim

22   impact and the impact on the victims is extraordinarily

23   high.

24        And again, Your Honor, when you read the

25   letters, you can hear from the victims that it's the

1    misrepresentations that the government has charged and

2    alleged in both the information in this case and as well

3    as the plea agreement here, those are the

4    misrepresentations that people relied on in investing

5    these things.  They tie very closely together.

6            Now, a little bit maybe, Your Honor, about the

7    nature of the scheme.  I think Mr. Shinners has touched on

8    this a little bit.  But just to make sure the government's

9    position on what happened is very clear:

10           That beginning in the spring of 2014, Mr. Garza

11   was in the business of actually selling and shipping

12   miners.  And in the government's view at that time there

13   was nothing -- there was nothing wrong with what he was

14   doing at that point.

15           He makes this decision, Your Honor, to

16   essentially in the first instance house miners on behalf

17   of investors rather than ship them to them.  And again, I

18   think you heard Mr. Shinners talk about -- that takes away

19   some of the logistical aspect of housing these miners.

20           What ends up happening is, be it because of heat

21   or other logistical issues, he's having a difficult time

22   having those individuals have access to those miners that

23   he's housing for them, and as a result he makes this shift

24   into the Hashlets, which is this virtual mining thing

25   where, hey, don't worry about it, we'll do the mining for

1       you, you invest in this and you get a slice of whatever

2       the profit is that comes from that.

3                   Worth mentioning that before that, Your Honor,

4       you mentioned the $8 million sale around the August of

5       2014 time period.  That was something that was intended,

6       in the government's view, to gin up business and gin up

7       excitement and to demonstrate financial viability.

8                   Again, if there's $8 million kicking around to

9       buy a company, how bad could it actually be?  Or the

10      company can't be in bad shape financially if it's spending

11      $8 million to buy another company, when that's not the

12      case.

13                  And again, this is all stuff that the investors

14      are looking at and weighing in making a decision as to

15      what to do.

16                  Again, once he gets into the Hashlets, Your

17      Honor, there are those misrepresentations about always

18      being profitable, never being obsolete.  And again, not

19      only does he make those representations knowing that

20      they're not true, but what you have that comes on top of

21      that is the misapplication of later investor funds to

22      earlier investor funds which tends to demonstrate that

23      they're always profitable, right?

24                  So not only has he said this, but for the

25      investors, it appears to be the case because they're not

1    sort of looking behind the curtain and seeing that the

2    origin of the money that they're taking out is from later

3    investors.  They think that it's, hey, he was right, it

4    was always profitable.

5            And again this gets to where I started, Your

6    Honor, which is the third shift, which goes to PayCoin as

7    well, which is, as the squeeze was felt a little bit more,

8    it was a, hey, let's move you over to PayCoin as well.

9    And as I said, that had the impact of lessening the

10   financial squeeze as well as attracting additional

11   investors.

12           THE COURT:  We're going to need to take a break.

13   Would this be a good time?

14           MR. PIERPONT:  This would be a good time, yes.

15           THE COURT:  All right.  We'll be in recess for

16   20 minutes.

17              (Whereupon, a recess followed)

18           THE COURT:  All set to proceed?

19           MR. PIERPONT:  Yes, Your Honor.

20           I believe, Your Honor, I have said everything I

21   need to say regarding victim impact, but the 3553(a)

22   factors, in the government's view, that sort of talks

23   about the seriousness of the offense and to promote

24   respect for the law.  I want to take a moment to talk

25   about deterrence as well.

1           I will note for the Court, there is another

2    victim in the courtroom here, he is local, who would like

3    the opportunity to speak to Your Honor when I conclude.  I

4    suspect that will be in short order.  I will ask him to

5    come up.  I don't believe that would take more than a

6    couple of minutes.

7           But he is here and would like the opportunity to

8    speak as well.

9           THE COURT:  Okay.

10          MR. PIERPONT:  So deterrence, Your Honor, I will

11   just reiterate what was in the memo.

12          In some ways the parties are agreed that

13   deterrence in a white collar case there is a large

14   deterrent effect that can be had, especially in a white

15   collar case where parties are weighing risks and rewards

16   more than they might otherwise be.

17          What I think is particularly important in this

18   context is we're talking about a novel field.  There, of

19   course, have been prosecutions on the dark web related to

20   the use of Bitcoin for various things.  But in terms of

21   people launching crypto currencies and people doing these

22   ICOs or initial coin offerings, this is a relatively new

23   development that has really started to crop up of late,

24   and there's been a significant amount of attention on this

25   case, in particular, that has been generated here because

1    it was a large fraud as we've talked about here.

2           And so, you know, I did want to point out to the

3    Court that to the extent deterrence is something that the

4    Court should be thinking about in crafting an appropriate

5    sentence, there are a lot of people in this crypto

6    currency stage who are watching to see what will happen

7    here.  So the message will be received by the Court,

8    however the Court determines whatever sentence is

9    appropriate here.

10          Finally, Your Honor, I want to touch on the ABA

11   guidelines because I know that was something that was

12   raised in the defendant's sentencing memo.  You know, in

13   the government's view there's not a large difference

14   between the guidelines range that is generated by the loss

15   under the Sentencing Guidelines versus those under the ABA

16   Guidelines.  I do think there's a small difference there.

17          But if you look at the defendant's conduct in

18   this case, specifically, Your Honor -- and we put this in

19   our sentencing memo -- if you look at the technical

20   expertise that was required to perpetrate this, along with

21   the duration of the fraud, which in the government's view

22   begins with the first misrepresentation back if August and

23   concludes around the January timeframe of 2015, we're

24   looking at a nine-month time period that we're looking at

25   here.  This is multiple months.

1           So in the government's view, that is high

2      culpability.  And then from the victim perspective, I

3      think as Your Honor has both heard and read in the

4      letters, this is one where there is high culpability as

5      well.

6           So if Your Honor was inclined in considering

7      whether to give a varying sentence using the ABA

8      Guidelines as a touch point, that would be the

9      government's submission there.

10          So with that, Your Honor, I'm going to ask Mark

11     to come forward and maybe take a few moments of your time

12     and after that the government will be finished with its

13     presentation.

14          THE COURT:  Thank you.

15          SPEAKER:  Good morning, Your Honor.  Thank you

16     for letting me speak for about a minute or two.

17          My name is Mark, I live in Connecticut.  I'm

18     college educated, also self-employed, and I've been

19     managing my own investments since high school.  I've

20     always been fairly conservative with my investments.  I've

21     seen markets go up, markets go down.  I know investments

22     can be risky, so I'm not fooling myself with that.

23          When I learned about -- I started hearing about

24     Bitcoins I was interested in trying to -- you know, they

25     became interesting to me because I heard about mining

1    people and making money.

2         And then with Mr. Garza, I read about it in a

3    trade journal and he talked about, oh, here's a way of

4    mining Bitcoins without having to go through all the

5    technical problems of setting up servers and mining

6    equipment and so forth.  To me that seemed attractive, so

7    I started making small purchases and that seemed to be

8    working out.  And I just kept at it from October 2014

9    through December.

10         And then so I invested about $35,000 of personal

11   savings in this.  Not that much money, but still for me

12   it's about two years worth of spare cash I accumulated.

13   And then I converted that to PayCoins because it seemed to

14   be this is a new thing.  It was being sold as -- marketed

15   as Amazon is buying into this, all these other big

16   companies.  And what really sold me was the 20-dollar

17   guaranteed price point.

18         In addition, I read a press release and

19   associated GAW and Mr. Garza with Cantor Fitzgerald, and

20   to me it seemed this big Wall Street firm, they're not

21   idiots, they know how to make money, they do due

22   diligence, they would not be involved with a fly-by-night

23   operation.  That to me was a gold standard.  It gave me a

24   lot of confidence that the whole PayCoin platform, the

25   currency, plus the whole mechanism for using it to promote

1    sales would be a good investment.

2              But it didn't work out that way.  There wasn't

3    much I could do once I saw the price plummet.  It might

4    have been within days or weeks.  So I lost -- it took me

5    about year and a half, two years to regain those savings.

6              My wife is also employed.  So we didn't suffer

7    like some of the other victims, but it might postpone my

8    retirement about a year or two.

9              It's not the end of the world.  I knew about

10   risk, about stock markets and investments, but I never

11   anticipated I would be lied to and told a fib about what

12   was actually there.

13             I knew Bitcoins could crash to zero, but I never

14   thought someone would make something up just to make

15   things up like that.

16             It hasn't really made me cynical, but it does

17   rattle my faith a bit in the American enterprise system,

18   would you believe?

19             I keep my money with a big Wall Street firm, one

20   of the big investment houses, you know, I trust they're

21   doing -- I trust they're being careful.  But in this case,

22   this was not a big Wall Street firm, it was just someone

23   who had a good story to tell and I believed it.

24             So I think it's affected myself, my wife and,

25   you know, it's money which, you know, it's the price of a

1    new car, five years' vacations maybe.

2            It kind of hurts at my age.  I'm almost 60.  You

3    just don't get that type of a pay rise that quickly when

4    you're self-employed.  So it set me back a bit.

5            It was deceiving, and I think there were a lot

6    of people in my category, and I speak for myself and

7    dozens, maybe hundreds of others.

8            Thank you.

9            THE COURT:  Thank you.

10           MR. PIERPONT:  So in sum, Your Honor, what we're

11   looking at here is a 9 million-dollar fraud with hundreds,

12   if not thousands, of victims.

13           And during the pendency of this fraud as in the

14   sentencing memorandum, Mr. Garza did spend extravagantly.

15   There was a new car, private jets, and at the conclusion

16   of the fraud, a couple months after, he did in fact travel

17   to Dubai and did spend or charge north of a hundred

18   thousand dollars afterwards when there was no question at

19   that point that the jig was up, as it were.

20           And so for that reason, Your Honor, the reasons

21   in the government's sentencing memo, and all the filings

22   in this case, the government asks for an appropriate

23   sentence in this case.

24           Thank you.

25           THE COURT:  Thank you.

1            MS. PEERCE:  Good afternoon Your Honor, Marjorie

2     Peerce on behalf of Josh Garza.  And in addition to my

3     remarks, Your Honor, Mr. Garza's father-in-law, Allen,

4     submitted a letter, which is at L9 in our papers, would

5     like to address the Court.  And after Allen, whose last

6     name I just don't want to put on the record, Mr. Garza

7     would like to address the Court, if that would be

8     acceptable to the Court.

9            I first want to convey that the Josh Garza who

10    is the before the Court today is very different than the

11    Josh Garza I met in May of 2015.  That man was arrogant,

12    he was fool hearted, and he had convinced himself he was a

13    victim of others; and so I just think that that is

14    important as we address what are clearly people who are

15    harmed by his conduct.

16            He made false statements, he made

17    misrepresentations, he deceived investors.  But I can tell

18    Your Honor that that is not the Josh today.  As I hope we

19    have conveyed in our submission, he has grown immensely.

20    He will stand before you in a couple of minutes, and in a

21    letter he submitted to the Court, which he wrote, he's

22    acutely aware of the harm he inflicted on others.

23            He started out this business legitimately.  You

24    heard it from the government this morning.  It started off

25    legitimately, and it evolved into something that was

1    illegal.  And rather than putting up a stop sign and

2    saying "I'm over my head," the greed, the inability to

3    recognize that what he was doing was wrong, the panic, he

4    engaged in criminal conduct, and there's no question about

5    it, and he hurt many, many people.

6            Today he recognizes that.  He's begun to

7    recognize that over the last year, I would say, Your

8    Honor, and he'll talk to you about that.

9            So I always say this:  As we note in our

10   submission, rehabilitation is one of the chief goals of

11   sentencing.  Josh is in the process of and has

12   self-rehabilitated quite a bit in the last three years.

13   He has used this time to look back on his actions, to

14   understand why he did what he did, and I believe that a

15   full record before the Court shows how much he has done to

16   demonstrate that he gets it, and he recognizes how wrong

17   his conduct was.

18           And I've heard the victims in the courtroom,

19   Your Honor, and I've read all their letters, and I'm very

20   upset that this man did this, as is he.  And I don't know,

21   Judge, whether two years ago I could have stood up here as

22   emphatically as I am now to tell you that the Josh Garza

23   from then is a different person.

24           There has been a -- it's almost like a light

25   switch that went about a year or so ago where I was

1    dealing with a different person than I had dealt with for

2    the preceding two years.  And his reaction when he read

3    the victim letters was very telling.  His words and his

4    actions, the things he said to me, were genuine.

5         Mr. Shinners -- and I believe that's the way the

6    name is pronounced -- was right.  Josh was not remorseful

7    after GAW happened.  It took time for him to come out of

8    his fog and recognize how wrong his conduct was.

9         He did go to Dubai, but he did come back.  He

10   retained counsel.  First it was a lawyer in Boston and

11   then me.  He dealt with the SEC, he dealt with the civil

12   plaintiffs, he dealt with this case, and this was before

13   the FBI had contacted him.

14        So I think it's important that, yes, he did go,

15   but he came back.  And he's been at every appearance.  He

16   drove up from where he lives to meet with probation in

17   July.  He has been faithfully at his court appearances.

18   He has abided by all of the conditions that have been

19   required of him.

20        There's -- so what I want to say is there's no

21   doubt that the Josh then is different than the Josh now.

22   So I'd like to now turn to his individual characteristics,

23   and these are very well set out, I believe, Your Honor, in

24   our submissions, so I will not repeat a lot, other than to

25   say:

1          He does come from a broken home.  He lived in

2      fear of his adoptive father.  He was abandoned by his

3      biological father before he was born, the financial

4      conditions of his home were dire.

5          So in high school, he determined to move with

6      his wife Jessica, then his then girlfriend, and her

7      parents -- the father is here in the courtroom,

8      mother-in-law is taking care of the children, who did come

9      up to Hartford to come to this court appearance, but after

10     I discussed this with Josh and talked about that there

11     were going to be some things that were going to be said

12     here today that might not be appropriate for the children

13     to hear, they are not here, but they are in Hartford and

14     Josh's mother-in-law is taking care of them.

15         That was a digression, Judge, but I thought it

16     was important for you, Judge, to know that.

17         So he moves to Vermont with Jessica's parents,

18     he built his first business in a basement, and he's worked

19     tirelessly since then.  And throughout his life -- and

20     it's important to recognize that he was only 29 when the

21     conduct at GAW happened -- he's been charitable with his

22     money and time, and we've set out some of those examples

23     in the sentencing submission, including a charitable

24     mission to an orphanage in Haiti, and just acts of

25     kindness that people have written to Your Honor about.

1          Josh will carry this felony conviction for the

2     rest of his life.  Now, I know every single person who

3     engages in criminal conduct runs the risk of that stigma

4     forever being with them.  He has no one to blame but

5     himself for this.  He is the father of three young

6     children.  There's another on the way, and he has already

7     had to look his children in the eyes and explain to them

8     how he did wrong and how he hurt so many people.

9          So that's who Josh is and I do want to talk,

10     Your Honor, a bit about the guidelines, and I'll have some

11     other comments as well.

12          I served on the Economic Crimes Task Force as

13     the co-chair of the MA CDL Sentencing Committee, and our

14     our objective was to try to find a different way of

15     calculating the appropriate guideline without loss being

16     the driver.

17          In that regard, one of the things that we

18     pointed to was what initiated the offense.  Did the person

19     go into the offense with the intention to commit a crime

20     or did that crime kind of happen as time went on?  And the

21     government has conceded it today, and I think that it's

22     been something that everybody has acknowledged.

23     Mr. Shinners, I think, acknowledged it, that it became

24     criminal after it had begun, and there was nothing wrong

25     at the beginning.

1           And so whether it started off as a predatory

2     offense or turned into a Ponzi scheme, which is what this

3     ultimately did, I think is very relevant.

4           I'll recognize and I'll be one of the first to

5     concede that there are nuances and people could look at

6     the guidelines in different ways.

7           Is his conduct culpable?  Moderate or high?  Are

8     there numbers of victims more?  I respectfully believe

9     that the number that we have proposed is the right one,

10    but I'm not going to sit here and say to Your Honor that

11    there's no other way of looking at it.  And indeed when we

12    drafted the report, we put brackets in the numbers because

13    we never actually reached a final conclusion as to what

14    the right numbers were.

15          But I do believe that the 9 million-dollar

16    figure, which is based upon calculations that the

17    government and the SEC did, and as I understand it, it's

18    money that came in.

19          You've heard Mr. Shinners talk about the fact

20    that there was a business, they were purchasing equipment,

21    there was a warehouse in Mississippi, there were

22    employees.  So there was a business here, it wasn't as if

23    there was just a complete fraud.  So I think that's very

24    important to recognize.

25          The government has focused on general deterrence

1       and talks about because it happened in the virtual

2       currency world and they're relatively novel and I think

3       the word Mr. Pierpont used this morning was nascent,

4       message needs to be sent that the conduct won't be

5       tolerated.  And I absolutely agree that deterrence is an

6       important factor in the Court's assessment of the right

7       sentence, but I don't think that sending Josh to jail is

8       required in order to send a general deterrence message.

9               The government is right, that crypto is

10      relatively new.  You can't lose sight of the fact that

11      Josh's conduct happened four years ago, spanning nine

12      months; and it was in the nascency of crypto currency and

13      it may have been one of the initial coin offerings.

14              This past year has shown an explosion by law

15      enforcement on crypto and the SEC and the CFTC.  There are

16      a myriad of prosecutions about how one cannot engage in

17      fraud with a ICO.  Fraud is fraud, you can't lie.  I speak

18      on panels about this all the time.  And just this week,

19      Judge Dearie in the Eastern District of New York, ruled

20      that the government can proceed with the securities fraud

21      prosecution arising out of an initial coin offering.

22              Why do I say all of this?  The message is out

23      there to the crypto world that you can't do what Josh did,

24      what other people are doing.

25              So this case has received a lot of press.

1    There's press here in the courtroom.

2            The fact the file of a conviction, the stigma,

3    the lifelong specter of being a felon, losing everything,

4    is well-known to anybody who is thinking of stepping into

5    this space.  And there are cases which talk about the fact

6    that general deterrence does not need to be achieved by

7    prosecuting a white collar offender.

8            I point to United States v. Edwards out of the

9    Ninth Circuit, and there the Court said that under 3553,

10   general deterrence does not require incarceration.

11   Probation and restitution in that case provided adequate

12   deterrence.

13           So my point, Your Honor, is I fully endorse and

14   recognize that general deterrence is a consideration for

15   the Court, as is rehabilitation; and, respectfully, I do

16   not believe that for general deterrence purposes that

17   incarceration is needed.

18           So I want to talk, if I may, Your Honor, for

19   just a little bit about the impact of incarceration with

20   respect to Jessica and the children.

21           I think the record leaves no doubt that Josh is

22   a loving and dedicated father and husband.  They have a

23   fourth child on the way.  He plays an integral role in

24   their lives.  As noted in the PSR which I do not wish to

25   go into on the record, Jessica has several medical issues

1    in the past.  Leaving her alone with three children and an

2    infant due early next year will be a tremendous burden on

3    her.  And it is a hard truth that the family relies on him

4    as their economic pillar.

5         And to there I want to point out that in the

6    last 15 months when this switch flipped with Josh, he's

7    been working tirelessly to build a new business from

8    scratch, one that is showing a profit and can be used to

9    repay the victims.

10        I did hear Mr. Shinners say here today that if

11   there were $9 million to be paid today that that's not

12   enough.  Respectfully, I believe that the ability to begin

13   to make restitution on top of everything else that's in

14   the record before the Court is an important consideration

15   for the Court.

16        I also think it's a rare defendant, Judge, who

17   before sentencing picks himself up and forges forward with

18   a new path in life, establishes a business, doesn't wait

19   around until the case is over.  Many of them sit around

20   despondent lashing out at the world for the predicament

21   they put themselves into.  There's no doubt that Josh did

22   that for quite awhile, it was everybody's fault but his.

23        But as he said in his letter to Your Honor,

24   after his mother died under tragic circumstances, quote,

25   "it was then that I finally knew I could no longer sit

1    around feeling bad for myself and I finally knew that I

2    needed to rebuild so I could care for my family and make

3    it right to all those who I had not been honest to and

4    harmed."

5           Finally I do want to note that there is no camp

6    where Josh's family lives in that state.  And if Josh is

7    incarcerated, it would be very difficult for Jessica and

8    the children to visit with him and to be able to maintain

9    the close relationship that is very important as these

10   children are growing.

11          Your Honor, the government cited a very recent

12   case which I happened to have seen before their brief came

13   in called United States v. Sample, which talks about white

14   collar defendants and that restitution can't be perceived

15   as a sentencing discount for the wealth.

16          We're not saying that he should get some sort of

17   discount because he's started a business.  What we're

18   saying is he can make restitution because he started a

19   business and he should be credited with that effort to

20   start this business to support his family, to be a

21   law-abiding citizen and a productive citizen in this

22   country.

23          He's kept the business lean so the profit could

24   be generated.  There's no question that the victims are

25   suffering, and he will be in a position to make

1    substantial restitution if the business continues to grow.

2              So finally, Your Honor -- and I'm sorry I've

3    taken so long but this is a, you know, very important

4    time -- this is Josh's first interaction, and it will be

5    his last, with the criminal justice system.  He will

6    forever carry a felony conviction.  He has had to look at

7    his children and tell them how he was wrong, how he

8    engaged in illegal conduct.  He will suffer from that

9    conviction for the rest of his life.  That is a serious,

10   significant, lifelong punishment.

11             Incarcerating him on top of that, when it will

12   likely destroy -- can't make any promises, but looking

13   forward -- likely destroy the vehicle to make payments,

14   and the family bond, will have a great impact on the

15   family bond, I do not believe is necessary as that term is

16   used under 3553(a).

17             So in conclusion, Your Honor I most respectfully

18   submit that after consideration of the full record in this

19   case, a non-incarcerative sentence fairly considers the

20   unique circumstances, including the needs of the victims

21   and the family, it would be sufficient, but not greater

22   than necessary, to accomplish the goals of sentencing.

23             I do want to say, if Your Honor is not prepared

24   to give a full probationary sentence, home confinement and

25   perhaps community service of some significant length, to

1    require -- suggestion to require Josh to go out and speak

2    to kids to say don't do what I did because you might end

3    up the way I ended up, might be just in addition to any

4    sentence that the Court considers imposing.

5             THE COURT:  I'd like to come back to the

6    discussion about how this was legitimate ab initio in the

7    meaning of the ABA task force report.  I want to be sure

8    I'm not misunderstanding.

9             It's undisputed that, as I believe Mr. Pierpont

10   said, the initial undertaking to acquire and resell

11   equipment was perfectly legitimate.  From that beginning

12   emerged what has been referred to as the first phase,

13   which is the cloud mining, so to speak.

14            It's your position that that was also legitimate

15   at the inception?

16            MS. PEERCE:  So, Your Honor, the way I read the

17   information in this case and the PSR, the government

18   points to the $8 million, the false statement about the

19   8 million-dollar acquisition of ZenMiners as essentially

20   the beginning of the illegal conduct, that's what's set

21   forth.  This business started in March and April.

22            And so although I believe that for loss

23   purposes -- and Mr. Pierpont can correct me if I'm

24   wrong -- I believe for loss purposes, it starts in May?

25   The loss starts in May.

1            In terms of the conduct that the information in

2       this PSR set forth, it's August.  And so I'm looking, Your

3       Honor, at that couple of month period.

4            I'm used to looking at fraud events that are

5       much long, nine months, six months, three months.  I'm

6       used to the ones that go on forever.  But here I'm

7       focusing on that window, when they say they first started,

8       when he had other persons in the business with him.  He

9       had never been in the crypto world.  When he first

10      started, this was exciting and legitimate.  No question

11      about it, within a few months, the switch turned.

12           But in terms of the ABA Guidelines and what we

13      were talking about was:  Did he start off with the

14      intention to commit a fraud?  And the answer to that is

15      no.  And that fraud started as it was going on.

16           THE COURT:  In that regard, I understand you to

17      be saying that the shift to cloud host mining, which led

18      to the misrepresentation about the acquisition, that phase

19      was legitimate at the beginning.  In other words,

20      Mr. Garza thought that cloud host mining was going to be a

21      profitable business, and while the misrepresentation about

22      ZenMiner being acquired for $8 million is clearly not

23      good, he wasn't planning on cheating anybody out of money

24      at that point in time.

25           MS. PEERCE:  I believe that's correct, Your

1   Honor.

2           THE COURT:  It was only in the second phase when

3   the Hashlet boom kind of caved in that the switch was

4   flipped, to use the phrase you just used.

5           MS. PEERCE:  I think that's fair, Your Honor.

6   That's when, you know, you had your money coming in and

7   your money going out, and there's not as much mining as --

8   they're not doing enough mining to be able to generate the

9   returns, but they have customers that are expecting

10  returns, and so that's when it becomes your equivalent of

11  a Ponzi scheme.

12          THE COURT:  And that phase, if we start from

13  that moment in time, lasted how long?

14          SPEAKER:  Well, I believe that PayCoin's launch,

15  its actual launch, was not supposed to be until January of

16  2015, but there are false statements around Thanksgiving

17  or the beginning of December about PayCoin, and it may be

18  that there's things being said even in November about what

19  PayCoin's going to do.

20          So it's in the November, December time period.

21  I don't mean to suggest that nothing happens until

22  January because there was a Wall Street Journal piece that

23  the government has pointed to where there's a statement

24  about the 100 million-dollar reserve; and so I believe it

25  would be fair, but obviously I look to Mr. Pierpont

1    because I do not want to make any misstatements at all.

2              I believe November 2014 through December 2014 is

3    a fair characterization of PayCoin, but if I could look at

4    Mr. Pierpont just to make sure?

5              MR. PIERPONT:  I believe it would be fair to say

6    that's when the bulk of the mischaracterizations were

7    made.  But there were still people relying on those

8    misrepresentations into -- all the way up until and

9    including the actual launch of Bitcoin, which was in

10    January.

11             And one other thing, while we're thinking about

12    the beginning of it, Your Honor, I think the government

13    would submit that the starting point would be actually a

14    little bit before the turn into the Hashlets.  Because

15    part of the motivating factors or why it was it went from

16    cloud mining hosting to the Hashlets is because he was

17    having trouble, as you heard from Mr. Shinners, with some

18    of the logistical stuff.

19             I'm not sure I'd cap it as to launching Hashlets

20    as much as to maybe in the weeks preceding the launch of

21    Hashlets when the sort of switch occurred.

22             MS. PEERCE:  And I don't disagree with that,

23    Your Honor.  I was trying to answer when it first started.

24             There's no question that there continues to be

25    activity in January after the launch.  I was trying to

1    address and make sure I was fair when that third phase, as

2    Your Honor has phrased it, when that happened.

3            THE COURT:  Understood.  I'd like to give you a

4    chance to comment on a couple of other factors relating to

5    culpability.

6            Using the ABA Task Force report, we see

7    reference to extenuating circumstances, meaning what

8    prompted the individual to commit the offense.  Did the

9    individual act under coercion or duress.  I'd like you to

10   comment on that, please.

11           MS. PEERCE:  Your Honor, there's no coercion or

12   duress here.  I could point to nothing that would suggest

13   he was forced into doing this.

14           What prompted it was in part greed, as he talked

15   about, and panic.  There were other people involved in GAW

16   and some of the people talk about it, that there were

17   others involved.  But Josh has taken responsibility for

18   his conduct here.

19           The government has made decisions about, you

20   know, whether it's going to prosecute people, and I'm not

21   quarreling with that.  But it's not like he was in a, you

22   know, a sealed room by himself.  There were others.  There

23   were people that were adults.  There were lawyers that

24   were consulted.  But I'm not here for a moment to minimize

25   that he is responsible for what he did.

1           But I think it is important to understand that

2     this was not done in a vacuum.

3           THE COURT:  All right.

4           Then finally, again with reference to the task

5     force report, did Mr. Garza take steps to mitigate the

6     harm at a time and in a manner that bears on culpability?

7           MS. PEERCE:  Judge, that's a very good question.

8           I think what happened was, Mr. Garza did

9     liquidate assets to put assets into GAW because he came

10    into this business with assets.  He liquidated them during

11    the course of it.  So, yes, there's mitigation.

12           I think that --

13           THE COURT:  Can you give me a sense of how much

14    money he put into GAW during the period in question?

15           MS. PEERCE:  May I have a moment, Your Honor?

16                (Pause)

17           MS. PEERCE:  Your Honor, this is a ballpark

18    figure, because I honestly hadn't anticipated this

19    question:  Somewhere around 150, $200,000.  He had some

20    exotic cars, expensive cars that he sold.  He put things

21    on credit cards.  I understand that's not necessarily an

22    asset, but he tried to put money in; and so there's an act

23    of mitigation.

24           I think that even with respect to the poor

25    gentleman whose name is, I think it's Robert, the poor

1    gentleman with the pancreatic cancer, I think that in his

2    misguided way to think that he could make this whole, I

3    think maybe he thought Bitcoin was -- he was going to hit

4    pay dirt and help people get their money back.  He went

5    about it the wrong way.

6            But in terms of mitigation, he did -- when they

7    came out of this, after they sold their home and indeed

8    sold the wedding ring at some point in the last three

9    years, they had nothing.  The kids were on food stamps, as

10   I understand it.

11           And so he had assets coming in and he came out

12   with no assets.

13           THE COURT:  Thank you.

14           MS. PEERCE:  Thank you, Your Honor.

15           If Allen could speak now?  And then Mr. Garza?

16   If that would be acceptable to the Court?

17           THE COURT:  That would be fine.

18           SPEAKER:  Good afternoon, Your Honor.

19           THE COURT:  Good afternoon.

20           SPEAKER:  My name is Allen.

21           First I'd like to say please excuse my use of a

22   written document.  I came on this trip with Josh and

23   Jessica not knowing I'd be appearing in court, much less

24   addressing the Court.

25           It is not my intention to reiterate points that

1    I've addressed in my letter to the Court, rather I'd like

2    to speak to what I have witnessed in the last year, year

3    and a half, regarding events that have happened since the

4    GAW Miners and changes that I've seen in Josh.

5         During the time frame of GAW Miners and for a

6    time afterwards, Josh had become an arrogant and

7    egomaniacal man.  Though I don't have a complete

8    understanding of the events involving GAW Miners, I did

9    see Josh turn into a man who had become very

10   self-centered, seemingly angry, and increasingly

11   withdrawn.  He was always defensive, he blamed others for

12   his legal difficulties, and in general for the bad

13   circumstances he had found himself in.

14        I've lived with Josh, Jessica and their children

15   for most of 2016 and 2017.  During the last year to 18

16   months, I've seen Josh develop and grow into a position of

17   taking responsibility for the events at GAW Miners,

18   expressing remorse for the people who have been damaged by

19   his actions and seeking solutions to provide restitution.

20        During the same timeframe, I also saw him return

21   to the characteristics that I've always known of him.

22   Those of being a humble man, a family man, and strong in

23   his faith.

24        He and my daughter have created a new and viable

25   company.  They started this company with a unique idea and

1    $60 that he borrowed from me.

2            As the business grew, Josh began to speak about

3    making restitution to the people and began making

4    restitution to people and helping people in general.  He

5    does have a history of philanthropy.  We had spoken

6    several times about how he wanted to do this, where he was

7    in the growth of this business, and how he would soon be

8    in the position to make good on damage caused by his

9    previous company.

10           We have spoken of his desire to correct the

11   damage and in context, aside from legal obligations, he

12   said on numerous occasions he wanted to do this because it

13   was the right thing to do.  He wants to do this to correct

14   the pain he has caused.  He wants to did do this because

15   of his strong faith.  To quote him exactly, he wants to do

16   this because it will make God happy.

17           I believe with every fiber of my existence that

18   he is sincere of that statement.

19           In the past, during and immediately after GAW

20   Miners, Josh had very little time for his children.  He

21   was always working, always busy, always mentally absent.

22   He took care of their needs as far as food, clothing,

23   shelter, but he was missing the critical time they needed

24   to be nurtured.

25           I am especially close to my granddaughter, their

1    young daughter.  Even though she is a child, she has

2    always opened up to me.

3         Excuse me.

4         A little over a year ago, I was taking her to a

5    local park to play, as I frequently have.  We talked en

6    route.  She told me, grandpa, I wish things were normal.

7    I asked her what she meant.  She said, daddy is always

8    busy, he never plays with me.  You always take us to the

9    park.

10        She would try to be with me as much as possible,

11   spending the night, always asking me to come pick her up.

12   But this too has changed.  Josh has returned to his

13   commitment to his family.  He's grown into not just being

14   their father but being their daddy.

15        As much of a loss as it is to me not having my

16   little granddaughter always wanting to be around grandpa,

17   I happily return to that role substituting that for her

18   own daddy.  Now she's definitely a daddy's girl.

19        Their oldest son has become a carbon copy of

20   Josh.  Same interest in technology.  Dresses like Josh,

21   fixes his hair like Josh, even helps in their company

22   whenever possible.  They play video games at night placing

23   silly bets on the outcome.

24        He has at a very young age become very

25   technically savvy, creative.  And Josh continues to mentor

1    and guide him.

2              Most importantly and foremost is the guidance

3    Josh provides in his church life.  Despite the pressures

4    and the needs for their company, Sunday is always reserved

5    for church and the family.

6              Through this entire experience has been bad for

7    our entire family.  It's been particularly hard on his

8    children.  They're too young to understand the

9    ramifications and the consequences of the actions of their

10   father.  All they've understood for a long time is daddy

11   can't take me to the park.

12             Josh has grown and matured.  He wants to correct

13   these transgressions, he wants to grow this business, he

14   wants to continue his spiritual growth and be a viable and

15   a valuable asset to his family and the community.

16             And with that, thank you for the time for

17   letting me speak.

18             THE COURT:  Thank you.

19             MS. PEERCE:  Your Honor, Mr. Garza would like to

20   address the Court.

21             THE COURT:  All right.

22             THE DEFENDANT:  Thank you for allowing me to

23   speak, Your Honor.  I don't think there's any way to start

24   other than to say I'm sorry for my conduct.

25             A lot of the things that were said here today

1    are true, and I accept that I caused those things.

2            I think for a long time I wasn't ready to accept

3    responsibility for my actions.  I was very angry and

4    wrong, and as my lawyer said, when my mom passed away, it

5    kind of put things in perspective because it made me

6    realize how fleeting life is and how wasteful it is to do

7    anything other than the right thing.

8            And I feel like for me it just, I don't know, it

9    kind of just clicked.  And no matter what happened, you

10   know, I was in charge and it was my job to keep customers

11   and investors safe, and I didn't.  You know, I made

12   misleading statements, I withheld information, just lied.

13   Downright lied.

14           And once I realized that and came kind of out of

15   this weird fog that I was in, I just decided I had two

16   choices:  To do nothing or do something, and I decided I

17   wanted to do something.

18           And the first thing I did was apologize to my

19   wife because she stood by my when I didn't deserve for her

20   to, and together we started something new because I

21   believed that if I worked hard enough at it, that

22   eventually it could become a vehicle that would be able to

23   help other people that I hurt.

24           It's difficult to, you know, learn new things

25   today, but when I saw the victim letters and read them, it

1    just drove everything home.  There's no other way I can

2    describe it.  I'm just ashamed for the time, you know, the

3    harm that I've caused other people.  I understand it and

4    I'm ashamed that I did it.

5              And at this point my only goal is, you know, it

6    was said earlier that a lot of the damage that's done is,

7    you know, not repairable, and I understand that.  There's

8    no way to turn back time, there's no way to give people

9    back things that, you know, they once had.

10             I just feel that the only thing I can do is, you

11   know, try to do everything in my power to get back what

12   was taken from people.  Because I know there are people

13   that would make a big difference to so they could continue

14   their live.  And that's my goal.

15             And so I truly am sorry mostly to the victims,

16   to the people that I hurt.  I'm sorry to the Court, the

17   Government.  I know it took time and resources.  And to my

18   family.

19             THE COURT:  Thank you.

20             Anything further?

21             MS. PEERCE:  Nothing from Mr. Garza's side, Your

22   Honor.

23             MR. PIERPONT:  Nothing further from the

24   government, Your Honor.

25             THE COURT:  All right.  We're going to take a

1    recess at this time.  We'll be in recess for 15 minutes.

2    After that, I'll return to the bench and we'll complete

3    the hearing.

4                    (Whereupon, a recess followed)

5                    THE COURT:  Thank you for your patience.

6                    This is an unusual case and a difficult one.

7    Mr. Garza engaged in serious misconduct that hurt a lot of

8    people in ways that are profound and, for many,

9    irreparable; and because of the extraordinary victim

10   impact, a sentence of probation is out of the question.

11   Instead, I need to determine what sentence is minimally

12   sufficient to impose just punishment for the wrongdoing

13   and the harm done.

14                    It is regrettable that the man who is being

15   sentenced today is not the one who engaged in this fraud,

16   but the fact remains it is the man who stands before the

17   Court for sentencing today who bears responsibility for

18   the wrongdoing and the harm done.

19                    It's also painful to realize that a sentence of

20   incarceration will be borne not just by Mr. Garza, but

21   also by his young family.

22                    I have considered the advisory guideline range,

23   which suggests a sentence of anywhere from 63 to 78

24   months.  I have compared that to the range generated by

25   the ABA Task Force approach.  I find that the latter

1    results in a range that is lower, but not by very much.

2    Because so much attention has been given to the analysis

3    suggested by the ABA Task Force report, I will comment

4    briefly.

5              I believe that the facts of this case warrant a

6    finding that the victim impact is high which results in

7    the six-level increase.  I think a persuasive argument can

8    be made that the facts support a culpability determination

9    of high culpability, but even if I view the facts in a

10   light most favorable to Mr. Garza, it is at least

11   moderate, and the upshot of that would be a range of 41 to

12   51 months.

13             Notably, that range reflects a loss amount of

14   more than 5,000,000, which is a 10-point increase rather

15   than more than 10, which is a 12-point increase, and here

16   the loss is much closer to 10 than five.  I mention that

17   just because it shows you how inevitably these things

18   can't be reduced to simple numbers.  Instead it requires a

19   judgment based on everything relevant to determining what

20   sentence is sufficient to serve the purposes of a criminal

21   sentence.

22             In addition to imposing just punishment, I think

23   a sentence of incarceration is necessary to provide

24   adequate general deterrence.  I think that a sentence of

25   probation would fail to provide adequate general

1    deterrence.

2         It's important for people to understand that

3    this misconduct is very serious, that the harm is grave,

4    and that if a person engages in this misconduct and is

5    found guilty, imprisonment is almost certainly going to be

6    part of the sentence.

7         The availability of home confinement as an

8    alternative to a sentence of imprisonment with the Bureau

9    of Prisons is one that I've considered carefully, and I

10   conclude that I can use that as a component of a sentence

11   that in its totality provides just punishment and adequate

12   general deterrence.

13        In thinking about what sentence of incarceration

14   is minimally required, I give weight to Mr. Garza's

15   statements, which I credit, that he is determined to make

16   amends to the best of his ability, and it appears that his

17   current business provides the best way for him to be able

18   to achieve that goal, and it is important that victims be

19   made whole to the extent that can happen.  I hope that the

20   sentence I impose today will not be so disruptive of the

21   business that it will impede Mr. Garza's ability to

22   provide restitution.

23        I'm satisfied that Mr. Garza will not offend

24   again.  I appreciate the candor of counsel and Mr. Garza's

25   father-in-law and indeed Mr. Garza himself in stating that

1    at the time of the offense conduct Mr. Garza was an

2    arrogant, egomaniacal, self-centered individual.  I think

3    that this helps explain what he did.

4            Given that he has tried as best he can in the

5    past year or so to make amends, I'm confident that he

6    won't offend again; and I do regret that he and his family

7    are obliged to pay the significant price that will

8    inherently follow from the sentence I'm about to impose,

9    but it's my responsibility to make my best judgment of

10   what the law requires, like it or not.

11           I conclude that Mr. Garza should be sentenced to

12   the custody of the Bureau of Prisons for a period of 21

13   months, and I will make whatever recommendation for a

14   designation that you will request of me.  I'm sorry to

15   hear that there's no camp nearby the family home.  That's

16   unfortunate, but I would appreciate your suggestions as to

17   what the recommendation should be.

18           With credit for good time, Mr. Garza will be

19   able to return home sooner than that, and at that point,

20   Mr. Garza, you will be on supervised release for a period

21   of three years.

22           The first six months of your supervised release

23   will be spent on home confinement as a substitute for

24   incarceration.  During that six-month period, you will be

25   confined to your home.  You will be allowed to leave to

1    work, to obtain medical care for yourself or a member of

2    your family, to participate in religious services, and to

3    perform community service; otherwise you will have to be

4    confined to your home unless you receive permission from

5    the Probation Office to leave your home for some specified

6    purpose.

7         The upshot is your freedom will be significantly

8    curtailed during that six-month period, which on top of

9    the 21 months in the BOP I think satisfies the demand for

10   a sentence that imposes just punishment without being

11   harsher than necessary in light of the harm done.

12        There will be other conditions that will apply

13   to you while on supervised release.  These are in the

14   nature of mandatory conditions in every case and standard

15   conditions.  They're numerous and I'm not going to detain

16   you by giving you the laundry list right now.  You will

17   receive these mandatory and standard conditions in writing

18   and you'll have a chance to read them; and if you have any

19   questions about what those conditions entail, you need to

20   err on the side of speaking with your probation officer so

21   that there's no misunderstanding.

22        You should bear in mind that the conditions are

23   intended to help you succeed on supervised release and not

24   trip you up.  It may be that there's some conditions that

25   don't make sense for you given your business, given your

1    family obligations, and if that's so, then we can modify

2    them.

3              As far as special conditions are concerned, that

4    is conditions imposed in addition to the mandatory and

5    standard conditions, you do have to make restitution.  The

6    agreed upon total amount is $9,182,000.  I know you're in

7    no position to pay that sum, but hopefully through your

8    business you will be in a position to begin to make

9    restitution.

10             As a special condition of your supervised

11   release, you will pay restitution in the amount of a

12   thousand dollars a month.  That amount can be modified

13   depending on your financial circumstances based on a

14   motion made by the Probation Office and approved by the

15   Court.

16             I think that the drug testing condition can be

17   dispensed with.

18             PROBATION OFFICER:  Yes, Your Honor.

19             THE COURT:  No fine is imposed because of your

20   obligation to make restitution, but you do have to pay a

21   special assessment in the amount of $100, which is

22   required by law.

23             In light of your obligation to make restitution,

24   there are a couple of special conditions that I need to

25   add.

1            One is, you will provide the Probation Office

2      with access to requested financial information and you

3      will authorize the release of financial information to the

4      Probation Office.  This condition is imposed when a person

5      has a large restitution obligation to enable the Probation

6      Office to monitor the individual's financial situation.

7            As a final special condition, while on

8      supervised release, so long as your restitution remains

9      unpaid, that is the balance has not been fully paid, you

10     will not incur new credit card charges in excess of $500

11     per charge, or open additional lines of credit without the

12     approval of the Probation Office.

13            Is there a request for a recommendation to the

14     Bureau of Prisons?

15            MS. PEERCE:  Your Honor, we have not been able

16     to locate a facility reasonably close, so what I would

17     request is -- I need to look at the map.  What we're

18     certainly going to request is the closest possible camp to

19     his residence, but if I could have the day to contact

20     chambers --

21            THE COURT:  That would be fine.

22            MS. PEERCE:  -- to make a specific request?

23            I have a question about the special condition

24     that Your Honor just imposed of the 500-dollar credit card

25     charge.

1           There is a business here and I am presuming, but

2     I just want to make sure, that that applies to personal

3     credit card charges and not to business charges.

4           THE COURT:  That was my intention.

5           MS. PEERCE:  I just wanted to clarify that.

6           And, Your Honor, if I could request voluntary

7     surrender?

8           I have discussed this with -- we have discussed

9     this with Mr. Pierpont.  I would request three months for

10    the voluntary surrender.  We are hopeful that maybe that

11    can get the business in a position to enable Mr. Garza to

12    be away for, like, 18 months, which is what I think about

13    with good time, 17, 18 months.  If we're not in a

14    position, we would come back and ask for more, but my

15    understanding is the government consents to that.

16          MR. PIERPONT:  It does, Your Honor, certainly

17    with the understanding that that time will be well spent

18    putting in order and thinking about victims and

19    restitution matters that that will be time well spent.

20          MS. PEERCE:  And that is the purpose of

21    requesting it, Your Honor.

22          THE COURT:  That makes sense to me.

23          Whatever we can do to help facilitate

24    restitution is of course something that we should do.

25          So, do you have a specific date that you would

1    like to suggest?

2              MS. PEERCE:  I don't.  I think that takes us to

3    mid-December.

4              So, frankly, Your Honor, looking at that, if we

5    could have right after New Year's, if that's okay with the

6    government?  Because I think that's right, that would take

7    us to like December 13th.

8              MR. PIERPONT:  Early January is fine with the

9    government.

10             THE COURT:  Mr. Garza, you will self surrender

11   to the place designated by the Bureau of Prisons on Friday

12   January 5 by 2:00 in the afternoon.  Until then, you will

13   continue to be at liberty subject to the same conditions

14   that have applied until now.  They don't change, except

15   for the added condition that you self surrender to the BOP

16   facility on that day, January 5, not later than 2:00.

17             THE CLERK:  I think it's, I don't know, January

18   4 in 2019.

19             THE COURT:  Do I have the wrong year?  I might

20   well.

21             Do you have January 4, is that a Friday?

22             MS. PEERCE:  January 4 is a Friday, Judge.

23             THE COURT:  Very good.  January 4, 2019 not

24   later than 2:00.

25             This will give the Bureau of Prisons plenty of

1    time to designate a facility, so I don't anticipate that

2    there will be any risk of you not receiving a designation

3    in advance of your self-surrender date.  But in the

4    extremely unlikely event that such a problem should arise,

5    you are not expected to self surrender to a local jail;

6    instead, the order requires you to self-surrender to a

7    facility of the Bureau of Prisons.

8              If you haven't received a designation from the

9    Bureau of Prisons, then you should contact the U.S.

10   Marshal and obtain the Marshal's guidance as to which BOP

11   facility you should surrender to, okay?

12             Anything further?

13             MS. PEERCE:  So if I can be in touch with

14   chambers by close of business tomorrow, if we have a

15   recommendation -- a request for a recommendation beyond

16   the closest facility to Mr. Garza's home?  I don't know

17   whether we will, but we will look and I will be in touch

18   with chambers.

19             THE COURT:  All right.  We'll wait to hear from

20   you.

21             MS. PEERCE:  Thank you.

22             MR. PIERPONT:  Your Honor, would Your Honor mind

23   going over with the defendant the right to appeal and the

24   waiver in the plea agreement as well?

25             I'm not sure, maybe you did that already, but I

1    don't recall that.

2              THE COURT:  Mr. Garza, under the law, I'm

3    obliged to advise you at this time about your right to

4    appeal.  In your plea agreement, you waived your right to

5    appeal your conviction or your sentence provided the

6    sentence did not exceed 78 months imprisonment, three

7    years of supervised release, a $20 million fine and

8    restitution in the agreed-upon amount.

9              This sentence is well below that, so I believe

10   that you have waived your right to appeal as part of your

11   plea agreement.

12             Even so, I'm required to inform you that you

13   would still retain a right to appeal notwithstanding your

14   apparently valid waiver if you believed that your plea

15   agreement and your waiver was the result of a violation of

16   your rights either because Ms. Peerce failed to represent

17   you adequately or the government engaged in some form of

18   misconduct that caused you to enter into this agreement

19   and waiver.  I'm not aware of anything that would suggest

20   anything along that line, and so as far as I know, you

21   have validly waived your right to appeal.

22             But if you entertain the thought that maybe

23   something like that happened, then you could still appeal

24   on that basis; in which event, you would need to file

25   what's called a Notice of Appeal, and that notice would

1    have to be filed within two weeks of the entry of the

2    written judgment.  The written judgment is likely to enter

3    tomorrow after we hear from Ms. Peerce, or perhaps early

4    next week.

5             The notice of appeal can be filed for free, and

6    if you were to appeal, a lawyer could be appointed to

7    represent you on appeal at no charge.  If the notice is

8    not filed in a timely manner, then you might well lose

9    whatever right to appeal you still retain.

10            If you have any questions about your right to

11   appeal, please speak with Ms. Peerce, all right?

12             THE DEFENDANT:  Yes.

13             THE COURT:  Anything further?

14             MR. PIERPONT:  Not from the government, Your

15   Honor.

16             MS. PEERCE:  Not from the defense, Your Honor.

17   Thank you.

18             THE COURT:  Thank you.

19                 (Proceedings adjourned at 1:27 p.m.)

20

21

22

23

24

25

1                 C E R T I F I C A T E

2

3                In Re: U.S. vs. GARZA

4

5

6            I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
              /s/_____
16
                 DARLENE A. WARNER, RDR-CRR
17                 Official Court Reporter
                 450 Main Street, Room #223
18               Hartford, Connecticut 06103
                     (860) 547-0580
19

20

21

22

23

24

25